UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

|  |  |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY COMPANY, ALLSTATE NEW JERSEY INSURANCE COMPANY, ALLSTATE NEW JERSEY PROPERTY & CASUALTY INSURANCE COMPANY AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, | X ) ) ) ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
| -against- | ) ) |
| SIMON ILYAICH a/k/a SEMEN ILYAICH, HUMBERTO J. ROMERO, EMILIO PAEZ, D.C., ANDREW SUSI, D.C., JOHN J. MCGEE, D.O., QUEENS-BROOKLYN MEDICAL REHABILITATION, P.C., QUEENS BROOKLYN JEWISH MEDICAL REHABILITATION P.C., QUEENS-ROOSEVELT MEDICAL REHABILITATION P.C., WOODWARD MEDICAL REHABILITATION P.C., ADVANCED MEDICAL REHABILITATION P.C., INTEGRATED MEDICAL REHABILITATION AND DIAGNOSTICS P.C., YELLOWSTONE MEDICAL REHABILITATION P.C., BEACH MEDICAL REHABILITATION P.C., ALTERNATIVE PROGRAM QUEENS DIVISION, INC., EXECUTIVE CORP., JBL MANAGEMENT INC. a/k/a JBL MANAGEMENT LLC, ALPHA CHIROPRACTIC, P.C., MEDICAL MANAGEMENT AFFILIATED, LLC, FRESH MEADOWS MANAGEMENT, INC., HJR MANAGEMENT, INC., YELLOWSTONE MEDICAL MANAGEMENT INC., SOFIYA BABADZHANOVA a/k/a SOFIYA ILYAICH, MIKHAIL ILYAICH a/k/a MICHAEL ILYAICH, YAN MOSHE a/k/a YAN LEVIYEV, LONDON BILLING & COLLECTIONS, INC., SION MARKETING, INC., 65-55 WOODHAVEN REALTY, LLC, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20, AND XYZ CORPORATIONS 1 THROUGH 20, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|  | ) |
| Defendants. | ) X |

---------------------------------------------------------------

**2013 CV**

---

**COMPLAINT**

**(TRIAL BY JURY DEMANDED)**

Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty

Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company (collectively, "Plaintiffs"), by their attorneys Stern & Montana, LLP, for their Complaint against Simon Ilyaich a/k/a Semen Ilyaich, Humberto J. Romero, Emilio Paez, D.C., Andrew Susi, D.C., John J. McGee, D.O., Queens-Brooklyn Medical Rehabilitation, P.C., Queens Brooklyn Jewish Medical Rehabilitation P.C.,   Queens-Roosevelt Medical Rehabilitation P.C., Woodward Medical Rehabilitation P.C., Advanced Medical Rehabilitation P.C., Integrated Medical Rehabilitation and Diagnostics P.C., Yellowstone Medical Rehabilitation P.C., Beach Medical Rehabilitation P.C., Alternative Program Queens Division, Inc., Executive Corp., JBL Management Inc. a/k/a JBL Management LLC, Alpha Chiropractic, P.C., Medical Management Affiliated, LLC, Fresh Meadows Management, Inc., HJR Management, Inc., Yellowstone Medical Management Inc., Sofiya Babadzhanova a/k/a Sofiya Ilyaich, Mikhail Ilyaich a/k/a Michael Ilyaich, Yan Moshe a/k/a Yan Leviyev, London Billing & Collections, Inc., Sion Marketing, Inc., 65-55 Woodhaven Realty, LLC, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 (collectively referred to as the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from in or about 1998 through the date of the filing of this Complaint, Defendants Simon Ilyaich a/k/a Semen Ilyaich ("Ilyaich"), Humberto J. Romero ("Romero"), Emilio Paez ("Paez") and Andrew Susi, D.C. ("Susi") (collectively the "True Owners"), and others unknown to Plaintiffs, presided over separate but similarly run enterprises that systematically stole millions of dollars from automobile insurance companies, including Plaintiffs -- activity that continues unabated to this day -- through New York State's No-fault system.   When not referred to individually by name, Romero and Paez are collectively referred

to as the "Romero Group."

2.     This action seeks to recover more than $2.3 million in fraudulently obtained proceeds and to prevent the Defendants from continuing to illegally seek reimbursement of benefits under New York State's No-fault system through fraudulently incorporated defendant professional corporations and an illegal fee-splitting arrangement with non-professionals, which is not permitted under the No-fault Law.

3.     At all relevant times mentioned herein, with the exception of Defendants Paez and Susi, who are purportedly licensed chiropractors, the True Owners were laypersons who were not licensed to practice any healthcare profession in the State of New York and are not licensed and/or authorized to operate and control a medical professional corporation, that orchestrated the fraud alleged herein with the assistance, participation and agreement of Defendant John J. McGee, D.O. ("McGee"), through the creation of illegally owned, fraudulently incorporated and improperly licensed medical professional corporations ("PCs") that were used to fraudulently bill insurance companies in general, and Plaintiffs, in particular.

4.     Through the enterprises described in this Complaint and a number of sham professional corporations, the True Owners used the No-fault system to steal millions of dollars through various entities they controlled, managed and/or operated.

5.     On information and belief, the True Owners implemented their schemes to defraud through the use of a complicit doctor, McGee, who in exchange for ostensibly being paid to provide medical services, allowed his name, signature and license to be used to fraudulently bill insurance companies.

6.     By allowing the use of his name and license, McGee permitted the True Owners to own, control and operate that in which they are prohibited by law from maintaining a financial

3

interest, *to wit*: medical professional corporations that must be owned exclusively by a licensed medical professional or like professionals acting within the scope of the professional corporation's authorized practice.   In so doing, the True Owners and McGee severely compromised the safety and integrity of the healthcare delivery system in New York State.

7.   On information and belief, in violation of the New York Business Corporation Law ("BCL") and Education Law, at the time of each of the Defendant PCs' respective incorporation or transfer of ownership, McGee was immediately divested of any interest and responsibility in the operation of the Defendant PCs and maintained no control over how they were operated and/or managed.

8.   On information and belief, McGee knowingly allowed fraudulent bills to be submitted under his name in association with the following Defendant PCs: Queens-Brooklyn Medical Rehabilitation, P.C. ("Queens-Brooklyn Medical"), Queens Brooklyn Jewish Medical Rehabilitation P.C. ("Queens Brooklyn Jewish Medical"), Queens-Roosevelt Medical Rehabilitation P.C. ("Queens-Roosevelt Medical"), Woodward Medical Rehabilitation P.C. ("Woodward Medical"), Advanced Medical Rehabilitation P.C. ("Advanced Medical"), Integrated Medical Rehabilitation and Diagnostics P.C. ("Integrated Medical"), Yellowstone Medical Rehabilitation P.C. ("Yellowstone Medical"), and Beach Medical Rehabilitation P.C. ("Beach Medical").   Said providers are collectively referred to herein as the "Defendant PCs."

9.   In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), the New York Court of Appeals held, in part, that a professional corporation not licensed in accordance with applicable New York State law is not (1) entitled to recover benefits under the New York State No-fault Law and implementing regulations irrespective of the date of service, and (2) that an insurer is entitled to recover payments made to

4

such an entity on or after April 4, 2002, the effective date of the amended No-fault regulations.

10.     At all relevant times mentioned herein, the Defendant PCs were fraudulently incorporated and, in furtherance of the scheme to defraud alleged herein, submitted fraudulent bills, medical records and reports to insurers, in general, and Plaintiffs, in particular, for reimbursement of medical services that were purportedly provided by legitimate professional corporations, when in fact they were not.

11.     The Defendant PCs are purported medical practices created in violation of Article 15 of the BCL, which governs the corporate practice of medicine in New York State and requires any corporation that provides physician medical services to do so as a professional corporation ("PC") owned and controlled exclusively by physicians.  The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to New York Education Law § 6512.

12.     On information and belief, in violation of Article 15 of the BCL, at the time each of the Defendant PCs were incorporated in the State of New York, McGee was divested of any and all attributes of ownership and control, which was then diverted by the True Owners to one or more management companies they owned and controlled.

13.     As described herein, Defendant Ilyaich controlled and was the true beneficial owner of Defendant PCs Queens-Brooklyn Medical, Queens Brooklyn Jewish Medical Queens Roosevelt Medical and Woodward Medical (collectively the "Ilyaich PCs") through management company defendants Alternative Program Queens Division, Inc. ("Alternative Program Queens"), Executive Corp. and JBL Management Inc. a/k/a JBL Management LLC ("JBL Management") (collectively the "Ilyaich Management Companies"), in which he maintained a similar ownership and financial interest.  By way of example and not limitation, the below table

5

identifies the specific management companies through which Ilyaich was able to conceal his ownership and maintain tight control over the PCs:

| Ilyaich Management Company and PC Relationship | | |
|---|---|---|
| PC | Management Company | True Owner |
| Queens Brooklyn Jewish | Executive Corp. | Simon Ilyaich |
| Queens-Brooklyn Medical | | |
| Queens Brooklyn Jewish | Alternative Program Queens | Simon Ilyaich |
| Queens-Brooklyn Medical | | |
| Queens-Roosevelt Medical Queens-Brooklyn Medical | JBL Management | Simon Ilyaich |
| Woodward Medical | ABC Corp. | John Doe |

14.     Similarly, the Romero Group controlled and were the true beneficial owners of Defendant PCs Advanced Medical, Integrated Medical and Yellowstone Medical (collectively the "Romero Group PCs") through management company defendants Medical Management Affiliated, LLC ("MMA"), Fresh Meadows Management, Inc. ("Fresh Meadows"), HJR Management, Inc. ("HJR") and Yellowstone Medical Management Inc. ("Yellowstone Management") (collectively the "Romero Group Management Companies"), in which one or more of the individuals in the Romero Group maintained a similar ownership and financial interest.   By way of example and not limitation, the below table identifies the specific management companies through which the Romero Group was able to conceal their ownership and still maintain tight control over the PCs:

| Romero Group Management Company and PC Relationship | | |
|---|---|---|
| **PC** | **Management Company** | **True Beneficial Owner** |
| Advanced Medical | MMA | Humberto Romero<br>Emilio Paez |
| Advanced Medical | Fresh Meadows | Emilio Paez |
| Advanced Medical | HJR | Humberto Romero |
| Integrated Medical | | |
| Yellowstone Medical | Yellowstone Management | Humberto Romero |

15.     On information and belief, Susi controlled and was the true beneficial owner of Defendant PC Beach Medical through management company defendant Alpha Chiropractic, P.C. ("Alpha Chiropractic"), in which Susi maintained a similar ownership and financial interest.

16.     Where applicable herein, Alternative Program Queens, Executive Corp., JBL Management, MMA, Fresh Meadows, HJR, Yellowstone Management, Alpha Chiropractic, and ABC Corporations 1 through 20 are collectively referred to as the "Defendant Management Companies."  In general, the ABC Corporations are additional management companies that one or more of the True Owners owned, controlled and operated, but are unknown to Plaintiffs at the time of the filing of this Complaint.

17.     On information and belief and at all relevant times mentioned herein, these separate and distinct groups of true owners and management companies carried out parallel but unrelated schemes to defraud in substantially similar ways.

18.     In carrying out their fraudulent scheme, the True Owners, and others unknown to Plaintiffs, used McGee's name to fraudulently incorporate different Defendant PCs through which they engaged in the unlicensed practice of medicine and held out the Defendant PCs to be legitimate professional service corporations that were properly licensed in accordance with applicable New York State and local law when, in fact, they were not.

19.     At all relevant times mentioned herein, although, pursuant to, and in purported compliance with, Section 1503 of the BCL, the True Owners caused McGee to be listed as the sole shareholder, officer and director of the Defendant PCs on the certificate of incorporation filed with the Department of State, McGee was in fact a nominal, paper owner, who, upon each of the Defendant PCs' incorporation, abdicated any true beneficial ownership interest therein and control to the True Owners who are not licensed to practice any healthcare related profession in the State of New York.  Reflective of the fact that McGee's interest in the Defendant PCs existed only on paper, he is interchangeably referred to herein as a "Paper Owner."

20.     In carrying out their scheme to defraud, Defendants stole millions of dollars from Plaintiffs by submitting and/or facilitating the submission of fraudulent medical claims for persons who allegedly sustained injuries covered by the New York Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").  Under that law, policyholders and others who sustain injuries in automobile accidents (the "No-fault claimants" or "Claimants") can obtain payments from the policyholders' automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the patients' physicians.  Patients can also assign those benefits to doctors and other properly licensed healthcare providers, enabling them to bill insurance companies directly for their services.

21.     To facilitate the wholesale and pervasive fraud alleged herein, the True Owners, and others unknown to Plaintiffs, created sham corporate entities intended to conceal and insulate them from their criminal activities. Such insulation started with the Defendant Management Companies, and others unknown to Plaintiffs, which served to further the fraudulent activities of the Defendant PCs involved and from which the illicit proceeds were

siphoned to other controlled entities that served as integral parts of the scheme to defraud.

22.    On information and belief, at all relevant times mentioned herein, the Defendant Management Companies entered into oral and/or written agreements with the Defendant PCs, ostensibly in connection with providing management services to the Defendant PCs. In fact, the management agreements obligated the PCs to pay exorbitant fees bearing no fair market value for the alleged services provided and were used to funnel millions of dollars in fraudulently obtained insurance payments to the True Owners, and others unknown to Plaintiffs, through the Defendant Management Companies.

23.    In addition to the foregoing, at all relevant times mentioned herein, Defendants Ilyaich and Romero with their co-conspirators, Defendants Sofiya Babadzhanova a/k/a Sofiya Ilyaich ("Babadzhanova"), Mikhail Ilyaich a/k/a Michael Ilyaich ("M. Ilyaich"), and Yan Moshe a/k/a Yan Leviyev ("Moshe"), and/or others unknown to Plaintiffs, established and/or owned, controlled and operated a series of companies that purportedly provided services such as billing and collection, marketing and/or offices space to one or more of the Defendant PCs, but were in actuality used to divert No-fault insurance payments made by insurance carriers, in general, and Plaintiffs, in particular, which were obtained through the criminal enterprise alleged herein.

24.    On information and belief, separate and apart from the management agreements with the Defendant PCs, the Defendant Management Companies entered into service and/or office space rental agreements with Defendants London Billing & Collections, Inc. ("London Billing"), Sion Marketing, Inc. ("Sion Marketing"), 65-55 Woodhaven Realty, LLC ("65-55 Woodhaven Realty") and XYZ Corporations 1 through 20, as a means to further disguise money that was funneled to the True Owners and their co-conspirators. The XYZ Corporations are additional companies that one or more of True Owners, their co-conspirators and/or others

9

unknown to Plaintiffs, owned, controlled and operated, but are unknown to Plaintiffs at the time of the filing of this Complaint, that were used to divert money paid to the PCs back to the True Owners and their co-conspirators.

25.    On information and belief, to facilitate the fraudulent scheme, the Defendant PCs would pay substantial sums of money to the Management Companies. As part of the written and/or oral agreements with the Defendant PCs, the Management Companies were purportedly responsible for providing billing and collection, marketing and/or other services either through the management company or through their co-conspirators. To create the illusion that it was providing such services, the Management Companies diverted PC funds for such purported services at different times to London Billing, Sion Marketing and 65-55 Woodhaven Realty on the Defendant PCs' behalf. In that regard, the Management Companies would either (a) divert portions of the management fees received from the Defendant PCs to London Billing, Sion Marketing and/or 65-55 Woodhaven Realty as payment for the services those companies allegedly provided; and/or (b) cause the PCs to issue checks to London Billing, Sion Marketing and/or 65-55 Woodhaven Realty directly even though the PCs did not have any agreement with either London Billing, Sion Marketing or 65-55 Woodhaven Realty to pay for such purported services or office space. In reality, the payments were only a means to further distance the True Owners, and their co-conspirators, from the profits of the scheme while ensuring that the profits were funneled to them and/or others unknown to Plaintiffs.

26.    On information and belief, London Billing, which is owned and/or operated by defendants Ilyaich, Babadzhanova (Ilyaich's mother) and M. Ilyaich (Ilyaich's brother), allegedly provided billing and collection services on behalf of Queens-Brooklyn Medical, Queens-Roosevelt Medical, Queens Brooklyn Jewish, Woodward Medical, Beach Medical, Advanced

10

Medical, Integrated Medical and Yellowstone Medical. In actuality, London Billing was used to divert No-fault insurance payments made by Plaintiffs to one or more of the True Owners in furtherance of the criminal enterprises alleged herein. Through agreements established between one or more of the True Owners, including Ilyaich, the Romero Group and/or Susi and London Billing, money from the Defendant PCs was diverted to one or more of the True Owners.

27.     On information and belief, Sion Marketing, which is owned and operated by defendant Ilyaich, allegedly provided marketing services on behalf of Queens-Brooklyn Medical. In actuality, Sion Marketing was used to divert No-fault insurance payments made by Plaintiffs to Ilyaich and/or others unknown to Plaintiffs in furtherance of the criminal enterprises alleged herein. Through agreements established between Ilyaich and Sion Marketing, money from the Defendant PCs was diverted to Ilyaich and/or others unknown to Plaintiffs.

28.     On information and belief, 65-55 Woodhaven Realty, owned and operated by defendants Romero and Moshe, allegedly provided office space to Yellowstone Medical. In actuality, 65-55 Woodhaven Realty was used to divert No-fault insurance payments made by Plaintiffs to Romero and Moshe and/or others unknown to Plaintiffs in furtherance of the criminal enterprises alleged herein. Through agreements established between Romero and 65-55 Woodhaven Realty, money from the Defendant PCs was diverted to Ilyaich and/or others unknown to Plaintiffs.

29.     On information and belief, in the end, the Defendant PCs were left nearly profitless, with virtually all the insurance proceeds diverted to one or more of the Defendant Management Companies, London Billing, Sion Marketing and/or 65-55 Woodhaven Realty for eventual disbursement to the True Owners, their co-conspirators and others unknown to Plaintiffs.

30.     On information and belief, the Defendant PCs were created to fraudulently bill insurance companies under New York State's No-fault Law and sweep the illicit profits gained therefrom to the True Owners, their co-conspirators and/or others unknown to Plaintiffs.

31.     On information and belief, the Defendants fraudulent activity continues to the very day as one or more of the PCs are still attempting to collect on their fraudulent bills through filing civil suits, pursuing arbitrations and seeking settlements and/or payment on outstanding fraudulent claims.

32.     The Defendant PCs, which held themselves out as being owned, controlled and operated exclusively by properly licensed professionals, were engaged in the unlicensed practice of medicine and were in violation of the proscription against the illegal corporate practice of medicine.  In doing so, the Defendants, and others unknown to Plaintiffs, perpetrated a fraud upon the public, Plaintiffs and upon any professional who relied upon their fraudulent medical bills.

33.     Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Defendant PCs, holding themselves out as being legitimate health care providers when, in fact, they were not.

34.     The Defendant PCs' fraudulent and illegal corporate structure subjects individuals purportedly involved in automobile accidents to treatment by non-physicians, masquerading as medical doctors who are seeking to circumvent the laws enacted by the legislature of New York to protect consumers.

35.     In direct contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, Defendants have circumvented the laws of the State and imperiled the welfare of

the public by engaging in the purchase and misuse of medical licenses. In so doing, Defendants have facilitated the transfer of the exclusive right to control the practice of medicine to lay people and defendant Susi, *to wit:* the True Owners, and others unknown to Plaintiffs.

36.     On information and belief, Defendants repeatedly violated the laws established by the State of New York to protect the public from the unlicensed practice of medicine for the purpose of converting money, in utter disregard of their impact on the premium-paying public.

37.     The duration, scope and nature of the Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud -- although that would be troubling enough -- they adopted a fraudulent blueprint as their business plan, and used it to participate in a systematic pattern of racketeering activity.

38.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to properly licensed professional corporations. In doing so, Plaintiffs seek damages and declaratory relief that Plaintiffs are not required to pay any of the Defendant PCs No-fault claims due to the PCs' (1) fraudulent incorporation and/or their control/ownership by a layperson; and/or (2) unlawful fee-splitting activities. Such claims continue to be submitted by and/or in the name of the Defendant PCs and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

39.     By way of example and not limitation, annexed hereto as Exhibit "A" is a spreadsheet listing the No-fault claims that Plaintiffs paid to Defendants, to which they are not entitled, because of their fraudulent corporate structure and unlawful fee-splitting. By way of

13

further example and not limitation, annexed hereto as Exhibit "B" is a spreadsheet listing the current No-fault claims that form the basis of Plaintiffs' request for declaratory relief. Said spreadsheets are grouped by claim number, PC, date of service and the amount billed.

## NATURE OF THE ACTION

40.    This action is brought pursuant to:

i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)    New York State common law; and

iii)    the Federal Declaratory Judgment Act.

## NATURE OF RELIEF SOUGHT

41.    Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and their assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for medical services they allegedly rendered to individuals covered by Plaintiffs under New York State's No-fault Law.

42.    Plaintiffs seek compensatory damages to recover damages that they sustained as a result of Defendants' fraudulently obtaining payments from Plaintiffs for purported medical services rendered to individuals covered by Plaintiffs under New York State's No-fault Law by fraudulently incorporated professional corporations.

43.    Plaintiffs seek compensatory and punitive damages to recover payments made to the Defendant PCs as a result of unlawful fee-splitting.

44.    Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

45.    Plaintiffs further seek a judgment declaring that:

      i)     Plaintiffs are under no obligation to pay any of the Defendant PCs' No-fault claims due to their fraudulent corporate structure;

      ii)    The Defendant PCs never had, and do not now have, standing to prosecute any claim for first-party No-fault benefits as an assignee of Covered Persons in any arbitration proceeding or lawsuit commenced in state or federal court due to its fraudulent corporate structure; and

      iii)   Plaintiffs are under no obligation to pay any No-fault claims for any services due to the Defendant PCs' unlawful fee-splitting.

46.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $2,300,000.00, the exact amount to be determined at trial, in payments which Defendants received for billing Plaintiffs for purported medical services provided by fraudulently incorporated professional corporations.

## THE PARTIES

**A.    Plaintiffs**

47.    Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.    Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.    Allstate Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.    Allstate New Jersey Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

15

51.     Allstate New Jersey Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.     Allstate Fire & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois

53.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Company, Allstate New Jersey Insurance Company Allstate New Jersey Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

54.     Allstate is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York, and provides automobile insurance coverage to its policyholders under and in accordance with New York State Law.

**B.     The "True Owner" Defendants**

55.     Defendant Simon Ilyaich a/k/a Semen Ilyaich ("Ilyaich") is a natural person residing in the State of New York and is one of the true beneficial owners of one or more of the Defendant PCs, including the Ilyaich PCs. Ilyaich is also one of the owners of, or otherwise maintains a financial interest in, one or more of the corporate defendants, including: Alternative Program Queens, Executive Corp., JBL Management, London Billing and Sion Marketing.

56.     At all relevant times mentioned herein, Defendant Ilyaich was one of the masterminds of an elaborate scheme to defraud and, along with others unknown to Plaintiffs, established the Ilyaich PCs that fraudulently submitted bills to insurers, in general, and Plaintiffs, in particular; established Alternative Program Queens, Executive Corp., JBL Management,

16

London Billing and Sion Marketing to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on their behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; and solicited and/or otherwise conspired with McGee to form the Ilyaich PCs. controlling every aspect of the PCs' activities in violation of the New York Business Corporation Law.

57.     Defendant Humberto J. Romero ("Romero") is a natural person residing in the State of New York and is one of the true beneficial owners of one or more of the Defendant PCs, including the Romero Group PCs.  Romero is also one of the owners of, or otherwise maintains a financial interest in, one or more of the corporate defendants, including:  MMA, HJR, Yellowstone Management and 65-55 Woodhaven Realty.

58.     At all relevant times mentioned herein, Defendant Romero was one of the masterminds of an elaborate scheme to defraud and, along with others unknown to Plaintiffs, established the Romero Group PCs that fraudulently submitted bills to insurers, in general, and Plaintiffs, in particular; established MMA, HJR, Yellowstone Management and 65-55 Woodhaven Realty to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on their behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; and solicited and/or otherwise conspired with McGee to form the Romero Group PCs controlling every aspect of the PCs' activities in violation of the New York Business Corporation Law.

59.     Defendant Emilio Paez, D.C. ("Paez") is a natural person residing in the State of New York and is one of the true beneficial owners of Advanced Medical.  Paez is also one of the owners of, or otherwise maintains a financial interest in, one or more of the corporate defendants, including:  MMA and Fresh Meadows.

17

60.    At all relevant times mentioned herein, Defendant Paez was one of the masterminds of an elaborate scheme to defraud and, along with others unknown to Plaintiffs, established Advanced Medical that fraudulently submitted bills to insurers, in general, and Plaintiffs, in particular; established MMA and Fresh Meadows to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on their behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; and solicited and/or otherwise conspired with McGee to form Advanced Medical controlling every aspect of the PCs' activities in violation of the New York Business Corporation Law.

61.    Defendant Andrew Susi, D.C. ("Susi') is a natural person residing in the State of New York and is the true beneficial owner of Beach Medical. He is the owner of, or otherwise maintains a financial interest in Defendant Management Company, Alpha Chiropractic.

62.    At all times mentioned herein, Defendant Susi was the masterminds of an elaborate scheme to defraud and, along with others unknown to Plaintiffs, established Beach Medical which fraudulently submitted bills to insurers, in general, and Plaintiffs, in particular; established Alpha Chiropractic to ensure that the profits from the criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Beach Medical's behalf to ensure that the profits from the criminal enterprise were funneled to him and his co-conspirators; and solicited and/or otherwise conspired with McGee to form Beach Medical controlling every aspect of the PC's activities in violation of the New York Business Corporation Law.

### C.    The Defendant Physician

63.    Defendant John J. McGee, D.O. ("McGee") is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number

18

165086, issued by the New York State Education Department on or about December 19, 1985.

64.      On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of the Ilyaich PCs, as well as unlawful fee-splitting with non-professionals, McGee sold his name and/or the use of his license for a fee and/or other compensation to Ilyaich and provided the essential means for Ilyaich to fraudulently incorporate and/or operate the Ilyaich PCs and/or to bill for purported medical services through the Ilyaich PCs in violation of applicable New York State Law.

65.      On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of the Romero Group PCs, as well as unlawful fee-splitting with non-professionals, McGee sold his name and/or the use of his license for a fee and/or other compensation to the Romero Group and provided the essential means for the Romero Group to fraudulently incorporate and/or operate the Romero Group PCs and/or to bill for purported medical services through the Romero Group PCs in violation of applicable New York State Law.

66.      On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Defendant PC Beach Medical, as well as unlawful fee-splitting with non-professionals, McGee sold his name and/or the use of his license for a fee and/or other compensation to Susi and provided the essential means for Susi to fraudulently incorporate and/or operate Beach Medical and/or to bill for purported medical services through Beach Medical in violation of applicable New York State Law.

**D.      The Defendant PCs**

67.      Queens-Brooklyn Medical Rehabilitation, P.C. ("Queens-Brooklyn Medical") was incorporated on or about May 11, 1998 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 65-10 99th

19

Street, LL1, Rego Park, NY 11374. McGee is the nominal Paper Owner of Queens-Brooklyn Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendant Ilyaich and/or the Ilyaich Management Companies, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Queens-Brooklyn Medical.

68.     Queens-Brooklyn Jewish Medical Rehabilitation, P.C. ("Queens Brooklyn Jewish Medical") was incorporated on or about December 3, 2003 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 69-10 99th Street, LL1, Rego Park, NY 11374. McGee is the nominal Paper Owner of Queens Brooklyn Jewish Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendants Ilyaich and/or Defendant Management Companies Alternative Program Queens and/or Executive Corp., in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Queens Brooklyn Jewish Medical.

69.     Queens-Roosevelt Medical Rehabilitation, P.C. ("Queens-Roosevelt Medical") was incorporated on or about April 30, 2002, dissolved by proclamation on or about February 26, 2004, and incorporated again on July 21, 2004, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 65-10 99th Street, LL1, Rego Park, NY 11374 and 452 Woodward Ave., Ridgewood, NY 11385. Defendant McGee is the nominal Paper Owner of Queens-Roosevelt Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendants Ilyaich and/or Defendant Management Company JBL Management, in exchange for allowing his name and license to be used on corporate filings made with the New York State

Departments of State and Education on behalf of Queens-Roosevelt Medical.

70.     Woodward Medical Rehabilitation, P.C. ("Woodward Medical") was incorporated on or about September 22, 2005 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 452 Woodward Ave., Ridgewood, NY 11385. Defendant McGee is the nominal Paper Owner of Woodward Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendants Ilyaich and/or ABC Corporations 1 through 20, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Woodward Medical.

71.     Advanced Medical Rehabilitation, P.C. ("Advanced Medical") was incorporated on or about March 1, 2001 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 918 Cypress Ave., Ridgewood, NY 11385 and 63-32 99th Street, Rego Park, NY 11374. McGee is the nominal Paper Owner of Advanced Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendants Romero, Paez and/or MMA, Fresh Meadows and/or HJR, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Advanced Medical.

72.     Integrated Medical Rehabilitation and Diagnostics, P.C. ("Integrated Medical") was incorporated on or about January 18, 2005 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 918 Cypress Ave., Ridgewood, NY 11385 and 1 Fulton Ave., Hempstead, NY 11550. McGee is the nominal Paper Owner of Integrated Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendant Romero and/or HJR, in exchange for allowing his

name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Integrated Medical.

73.   Yellowstone Medical Rehabilitation, P.C. ("Yellowstone Medical") was incorporated on or about May 2, 2007 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 65-55 Woodhaven Blvd., Rego Park, NY 11374. McGee is the nominal Paper Owner of Yellowstone Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendant Romero and/or Yellowstone Management, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Yellowstone Medical.

74.   Beach Medical Rehabilitation, P.C. ("Beach Medical") was incorporated on or about July 21, 2004 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 520 Beach 20th Street, Far Rockaway, NY 11691. McGee is the nominal Paper Owner of Beach Medical and, on information and belief, received a salary and/or other compensation for doing so from Defendants Susi and/or Alpha Chiropractic, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Beach Medical.

75.   On information and belief, at all relevant times mentioned herein, Defendant Ilyaich was the true beneficial owner of the Ilyaich PCs.

76.   On information and belief, at all relevant times mentioned herein, the Romero Group was the true beneficial owners of the Romero Group PCs.

77.   On information and belief, at all relevant times mentioned herein, Defendant Susi

22

was the true beneficial owner of Defendant PC Beach Medical.

### E.    The Defendant Management Companies

78.    Alternative Program Queens Division, Inc. ("Alternative Program Queens") was incorporated on or about October 23, 2002, and, until its dissolution by proclamation on or about October 27, 2010, purported to be a corporation authorized to do business in the State of New York, with its principal place of business located at 104-40 Queens Blvd., #2B, Forest Hills, NY 11375.

79.    On information and belief, Alternative Program Queens was otherwise used to funnel money from Defendant PCs Queens Brooklyn Jewish Medical and Queens-Brooklyn Medical, to Alternative Program Queens, which, in turn, paid huge sums of cash to Ilyaich and others unknown to Plaintiffs.

80.    Executive Corp. was incorporated on or about November 12, 1999, and is a corporation authorized to do business in the State of New York, with its principal place of business located at 63-32 99th Street, Rego Park, NY 11374.

81.    On information and belief, Executive Corp. was otherwise used to funnel money from Defendant PCs Queens Brooklyn Jewish Medical and Queens-Brooklyn Medical to Executive Corp., which, in turn, paid huge sums of cash to Ilyaich and others unknown to Plaintiffs.

82.    JBL Management Inc. a/k/a JBL Management LLC ("JBL Management") was incorporated on or about July 14, 2003, and is a corporation authorized to do business in the State of New York, with its principal place of business located at 452 Woodward Ave., Ridgewood, NY 11385.

83.    On information and belief, JBL Management was otherwise used to funnel money

from Defendant PC, including Queens-Roosevelt Medical and Queens-Brooklyn Medical and/or was otherwise used to funnel money from those PCs to JBL Management, which, in turn, paid huge sums of cash Ilyaich and others unknown to Plaintiffs.

84.     Medical Management Affiliated, LLC ("MMA") was incorporated on or about May 30, 2002, and is a corporation authorized to do business in the State of New York, with its principal place of business located at 192-15C 64th Circle, Apt 3B, Fresh Meadows, NY 11365.

85.     On information and belief, MMA was otherwise used to funnel money from Defendant PC Advanced Medical to Romero and Paez and others unknown to Plaintiffs.

86.     Fresh Meadows Management, Inc. ("Fresh Meadows") was incorporated on or about March 11, 1999, and, until its dissolution on or about August 24, 2010, purported to be a corporation authorized to do business in the State of New York, with its principal place of business located at 69-40B 186th Lane, Apt. 1A, Fresh Meadows, NY 11365.

87.     On information and belief, Fresh Meadows was otherwise used to funnel money from Defendant PC Advanced Medical to Fresh Meadows, which, in turn, paid huge sums of cash to Paez and others unknown to Plaintiffs.

88.     HJR Management, Inc. ("HJR") was incorporated on or about May 17, 1999, and is a corporation authorized to do business in the State of New York, with its principal place of business located at 88-47 164th Street, Jamaica, NY 11432.

89.     On information and belief, HJR was otherwise used to funnel money from Defendant PCs Advanced Medical and Integrated Medical to HJR, which, in turn, paid huge sums of cash to Romero and others unknown to Plaintiffs.

90.     Yellowstone Medical Management, Inc. ("Yellowstone Management") was incorporated on or about August 23, 2007, and is a corporation authorized to do business in the

State of New York, with its principal place of business located at 10 Whispering Field Drive, Northport, NY 11768.

91.     On information and belief, Yellowstone Management was otherwise used to funnel money from Defendant PC Yellowstone Medical to Yellowstone Management, which, in turn, paid huge sums of cash to Romero and others unknown to Plaintiffs.

92.     Alpha Chiropractic, P.C. ("Alpha Chiropractic") was incorporated on or about February 11, 2003, and is a corporation authorized to do business in the State of New York, with its principal place of business located at 30 Island Parkway N., Island Park, NY 11558.

93.     On information and belief, Alpha Chiropractic entered into a series of management agreements and/or other agreements with Defendant PC Beach Medical and/or was otherwise used to funnel money from one or more of the Defendant PCs to Alpha Chiropractic, which, in turn, paid huge sums of cash to Susi and others unknown to Plaintiffs.

**F.     Defendants London Billing, Sion Marketing and 65-55 Woodhaven Realty**

94.     London Billing & Collections, Inc. ("London Billing") was incorporated on or about February 14, 2002, dissolved on August 19, 2005, and then re-incorporated on February 1, 2007, and, until its dissolution by proclamation on or about July 27, 2011, purported to be a corporation organized under the laws of the State of New York, with offices located at 104-40 Queens Blvd., Forest Hills, Queens, NY 11375.

95.     On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, London Billing was used by one or more of the True Owners to funnel money from the unlawful activities of Defendant PCs through one or more of the Defendant Management Companies to London Billing and then to one or more of the True Owners, including but not limited to Ilyaich, the Romero Group, Susi and/or others unknown to

25

Plaintiffs.

96.     On information and belief, Defendant Babadzhanova is listed in public records as the principal, officer and director of London Billing, and Defendants Ilyaich and M. Ilyaich are also either principals, officers and/or directors of London Billing.

97.     Sion Marketing, Inc. ("Sion Marketing") was incorporated on or about July 18, 2000, and, until its dissolution by proclamation on or about January 27, 2010, purported to be a corporation organized under the laws of the State of New York, with offices located at 63-32 99th Street, Rego Park, NY 11374.

98.     On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, Sion Marketing was used by Ilyaich to funnel money from the unlawful activities of Defendant PC Queens-Brooklyn Medical to Defendant Ilyaich and/or others unknown to Plaintiffs.

99.     On information and belief, Defendant Ilyaich is listed in public records as the principal, officer and/or director of Sion Marketing.

100.    65-55 Woodhaven Realty, LLC. ("65-55 Woodhaven Realty") was incorporated on or about October 13, 2006, and is a corporation organized under the laws of the State of New York, with offices located at 32 Farmstead Lane, Glen Head, NY 11545.

101.    On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, 65-55 Woodhaven Realty was used to funnel money from the unlawful activities of Defendant PC Yellowstone Medical to Defendants Romero, Moshe and /or others unknown to Plaintiffs.

102.    On information and belief, Defendants Romero and Moshe are listed in public records as the principals, officers and/or directors of 65-55 Woodhaven Realty.

### G. The Individual Defendants

103.    Defendant Sofiya Babadzhanova a/k/a Sofiya Ilyaich ("Babadzhanova") is a natural person residing in the State of New York and is one of the principals, officers and/or directors of London Billing.    On information and belief, Babadzhanova is the mother of Defendants Ilyaich and M. Ilyaich.

104.    Defendant Mikhail Ilyaich a/k/a Michael Ilyaich ("M. Ilyaich") is a natural person residing in the State of New York and is one of the principals, officers and/or directors of London Billing.    On information and belief, M. Ilyaich is Defendant Babadzhanova's son and Ilyaich's brother.

105.    Defendant Yan Moshe a/k/a Yan Leviyev ("Moshe") is a natural person residing in the State of New York and is one of the principals, officers and/or directors of 65-55 Woodhaven Realty.

### H. The John Does

106.    John Doe Defendants 1 through 20 (collectively, "John Does") are additional individual defendants that are unknown to Plaintiffs who conspired with the Defendants and participated in the operation and management of one or more of the enterprises described herein. Similar to the Individual Defendants named herein, the John Doe Defendants are also principals, officers and directors of the Defendant Management Companies and/or other companies that otherwise conspired and directly participated in the affairs of each enterprise, including engaging in the unlawful conduct alleged herein.    These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

### I. The ABC Corporations

107.    Defendant ABC Corporations 5 through 20 are additional management companies

that are unknown to Plaintiffs, and are owned, controlled and operated by one or more of the True Owners and/or others unknown to Plaintiffs, and which purported to entered into management agreements and other contracts with the Defendant PCs and were used to funnel money to the True Owners, and others unknown to Plaintiffs. Similar to the Defendant Management Companies named herein, the ABC Corporations also are the alter egos of the True Owners and/or others unknown to Plaintiffs and their associates and conspired and assisted in the fraudulent and unlawful conduct alleged herein. These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

### J. The XYZ Corporations

108. Defendant XYZ Corporations 1 through 20 are additional companies that are unknown to Plaintiffs and are owned, controlled and operated by one of more of the True Owners and/or others unknown to the Plaintiffs for the purpose of concealing and/or diverting the proceeds of the fraud in violation of state and federal law. Similar to London Billing, Sion Marketing and 65-55 Woodhaven Realty, the XYZ Corporations also are the alter egos of the True Owners and/or others unknown to Plaintiffs and conspired and assisted in the fraudulent and unlawful conduct alleged herein. These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

### JURISDICTION AND VENUE

109. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(l) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

110. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1961, et seq., because they arise under the laws of the United States, and under principles of pendent jurisdiction.

111. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

112. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the complaint occurred.

**FACTUAL BACKGROUND AND ALLEGATIONS
APPLICABLE TO ALL CAUSES OF ACTION**

113. Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

114. Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

115. On information and belief, the Defendant PCs are ostensibly healthcare providers that bill for treatments to, among others, individuals covered under the No-fault Law. In exchange for their services, the Defendant PCs accept assignments of benefits from their patients covered under the No-fault Law (the "No-fault claimants" or "Claimants") and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

116. Under the No-fault Law and implementing regulations, a provider of healthcare services is not eligible for reimbursement under Section 5102(a)(1) of the Insurance Law if the

29

provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

### A.    Control / Ownership of Professional Corporations

117.    Pursuant to Section 1504(a) of the New York State Business Corporation Law and regulations promulgated by the New York State Department of Health, professional service corporations may only render professional services through individuals authorized by law to render such professional services.

118.    Section 1504(c) of the Business Corporation Law of the State of New York requires, among other things, that:

> each report, diagnosis, prognosis, and prescription made or issued by a corporation practicing medicine, ... physiotherapy or chiropractic shall bear the signature of one or more physicians, ... physiotherapists, or chiropractors, respectively, who are in responsible charge of such report, diagnosis, prognosis, or prescription.

119.    Section 1507 of the Business Corporation Law of the State of New York prohibits a shareholder of a professional service corporation from issuing shares, entering into an agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice. "All shares issued, agreements made or proxies granted in violation of this section [1507] are void."

120.    Similarly, under section 1508 of the Business Corporation Law of the State of New York, no individual may be a director or officer of a professional service corporation unless that individual is authorized by law to practice in the same profession that the corporation is authorized to practice.

121.    Section 1503(b) of the Business Corporation Law of the State of New York

requires that the certificates of incorporation for an entity seeking to practice as a professional service corporation state the profession to be practiced by such corporation and the names and resident addresses of all individuals who are to be the original shareholders, directors and officers of such corporation.

122.    The restrictions contained in Article 15 of the B.C.L. were meant to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are in fact controlled only by qualified members." New York Legislative Annual 1970, p. 129 (emphasis added).    Restrictions in B.C.L. § 1507 in particular were designed to "insure that a professional service corporation [such as the Defendant PCs here] could not be controlled by a layperson". See New York State Legislative Annual 1971, p. 130 (emphasis added). These are not mere technical requirements, but are part of an important and long-established regulatory scheme specifically designed by the Legislature to protect patients' health and safety and to insure the ethical and competent practice of the profession of medicine. See People v. Cole, 219 N.Y. 98 (1916) (purpose of licensing provisions governing practice of medicine is to protect the public). Indeed, Section 6512 of the Education Law makes it a Class E felony to "fraudulently sell...any...license...purporting to authorize the practice of a profession." Moreover, the New York State Department of Health has determined that violating these important provisions constitutes "professional misconduct" that can result in the revocation of a physician's medical license.   Moreover, the statutory scheme "prohibits a licensed physician from allowing a non-licensed person to form a service corporation, to be a shareholder of a professional service corporation, or to control a professional service corporation." See 9/5/00 DOH Opinion (emphasis added).

123.    The implementing No-fault regulation promulgated by the Superintendent of

31

Insurance, 11 NYCRR § 65-3.16(a)(12) states, in relevant part, that "a provider of health care services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York...."

### B.    Fee-Splitting with Non-Professionals

124.    Pursuant to Sections 6509-a, 6530 and 6531 of the Education Law, neither a professional corporation nor its record owner may permit any person to share in fees that are generated by other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

125.    Under Section 6530(19), the prohibition against the sharing of fees also applies to any arrangement or agreement with non-physicians involving the furnishing of space, equipment and/or services to the medical professional corporation.

126.    Under Section 6530 of the Education Law and N.Y. Pub. Health Law § 230-a, fee splitting practices constitute professional misconduct and subjects a physician to serious penalties, including sanctions against a physician's medical license. New York's Business Corporation Law 1503(d) applies the Education Law's professional misconduct provisions to professional services corporations, which may have their certificates of incorporation suspended, revoked or annulled "for cause, in the same manner and to the same extent as is provided with respect to individuals and their licenses, certificates and registrations."

127.    Under 11 N.Y.C.R.R. § 65-3.16(a)(l2), a physician or professional incorporation engaged in fee-splitting is ineligible for reimbursement because such conduct constitutes a violation of a core licensing requirement.

**C.    Backdrop of Defendant PCs' Submission of Fraudulent Bills**

128.    In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 *et seq.*, the Defendant PCs submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3").

129.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms (NF-3s) submitted to Plaintiffs by the Defendant PCs contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

130.    To process and verify claims submitted by the Defendant PCs, Plaintiffs required, and the Defendant PCs submitted, to the extent applicable, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Covered Persons, for which the Defendant PCs were seeking payment from Plaintiffs.

131.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process claims for which a PC has standing to submit, within 30 days of receipt of proof of claim.

132.    To fulfill its obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Defendant PCs in support of their claims, and have paid the Defendants PCs based on the representations and information that Defendant PCs mailed to Plaintiffs.

133.    On information and belief, the True Owners created and/or used one or more of the Defendant PCs, medical practices ostensibly owned by McGee, to bill No-fault insurance

carriers for diagnostic and other medical services that were provided by fraudulently incorporated professional corporations and/or professional corporations owned, controlled and operated in violation of New York State Law, and by virtue thereof, were not and are not entitled to reimbursement of No-fault benefits.

134.    On information and belief, in violation of Article 15 of the BCL and Article 65 of the Education Law, McGee, a medical doctor, had no control and/or ownership interest in the Defendant PCs, the proceeds of which were diverted by the True Owners from Plaintiffs to the Defendant Management Companies, as well as to London Billing, Sion Marketing and/or 65-55 Woodhaven Realty, in which one or more of the True Owners maintained an ownership and/or financial interest.

135.    On information and belief, at the time each of the Defendant PCs were incorporated in the State of New York, McGee was divested of true beneficial ownership and control.

136.    By selling and/or permitting the use of his name and license, McGee knowingly provided the essential means by which the True Owners were able to own and control that in which they were prohibited by law from maintaining a financial interest in, to wit: professional corporations that must be owned exclusively by a licensed professional or like professionals acting within the scope of the professional corporation's authorized practice.

137.    On information and belief, Defendants knew or should have known that medical records, reports, and bills would be submitted to insurers, in general and Plaintiffs, in particular, on behalf of the Defendant PCs, each an entity that was not licensed in accordance with applicable New York State Law; that was imbued with an illegal corporate structure, engaged in unlawful fee-splitting, and not eligible to recover No-fault benefits.

34

138. On information and belief, between 1998 and the date of the filing of this Complaint, the Defendant PCs paid over to one or more of the Defendant Management Companies and/or one or more of the ABC Corporations, millions of dollars in fees, essentially representing nearly all of the gross billings that the Defendant PCs collected.

139. On information and belief, the millions of dollars that were diverted from the Defendant PCs to one or more of the Defendant Management Companies and/or one or more of the ABC Corporations were ultimately funneled to the True Owners.

140. On information and belief, in accordance with the McGee's illegal transfer of ownership and control, and in contravention of Sections 1503, 1504(a) and (c) and 1508 of the BCL, the True Owners exercised control over all aspects of one or more of the Defendant PCs, from billing, to preparing and creating medical reports, to signing medical records, to hiring all medical professionals, technicians, other employees and support staff to work for the Defendant PCs, to collecting on the medical bills submitted to insurance companies, to scheduling the purported medical services that were billed to insurance companies, to making personnel decisions, to retaining attorneys to pursue No-fault collections on behalf of the Defendant PCs, to retaining other professionals such as accountants, to controlling the bank account(s) opened in the name of the Defendant PCs, to determining what disbursements would be made from the Defendant PCs' accounts and to whom and for how much, to negotiating and determining what agreements would be entered into on behalf and/or in the name of the Defendant PCs and to controlling and managing all other aspects of the finances of the Defendant PCs.

141. On information and belief, the fraudulent activity continues to this day as the True Owners are directing and/or facilitating the Defendants PCs attempts to collect on the bills by

filing or causing to be filed arbitrations, civil suits and/or pursuing settlements to obtain payment for fraudulent insurance claims.

142.    On information and belief, consistent with the fact that one or more of the Defendant PCs were actually owned by the True Owners, the True Owners were not accountable to McGee with respect to the finances of the Defendant PCs.

143.    On information and belief, the True Owners did not provide, nor did McGee require or ever request, written daily, weekly, monthly or annual reports as to the Defendant PCs' income and disbursements.  In that regard, McGee's interest in the Defendant PCs was, at best, that of a mere employee with no ownership or financial interest tied into the profits of the Defendant PCs and the finances of the Defendant PCs were irrelevant to McGee as long as he received his salary and/or any other agreed upon compensation.

144.    Under the parallel schemes to defraud alleged herein, the True Owners used the name and license of McGee to enable the Defendant PCs to fraudulently bill for medical services throughout the metropolitan area of New York City.

### 1.    The Ilyaich PCs

145.    Defendant Ilyaich is a layperson, not licensed to practice any profession in the State of New York, who purchased and/or otherwise was permitted to use the name and license of McGee, a medical doctor, to fraudulently incorporate and/or otherwise own, control and operate the Ilyaich PCs in violation of applicable New York State law and, in furtherance thereof, circumvent Article 15 of the BCL, which prohibits lay person ownership of a professional corporation, and Article 65 of the Education law, which prohibits fee-splitting.  By doing so, Ilyaich concealed that he is the "true owner" of the Ilyaich PCs and fraudulently represented that they were legitimate professional corporations in compliance with core licensing requirements,

when in fact they are not.

146.    On information and belief, Ilyaich used Ilyaich Management Companies to operate and control all of the Ilyaich PCs operations and to funnel fraudulently obtained insurance payments to himself and others unknown to Plaintiffs.

147.    On information and belief, to ensure that ownership and complete control of the Ilyaich PCs remained with Ilyaich, the PCs' true owner, Ilyaich caused the Ilyaich PCs to enter into one or more oral and/or written agreements with the Ilyaich Management Companies, which Ilyaich also controlled and owned.

148.    On information and belief, the Ilyaich PCs' billing and collection activities were firmly controlled by Ilyaich and others under his direction, supervision and control. Through the foregoing PCs, Ilyaich prepared and/or caused to be mailed insurance claim forms in the PC's name(s). The claim forms prepared by Ilyaich and/or those acting under his control directed insurers to mail checks to locations that were designated by him and the proceeds of those claims were either deposited in bank accounts under his control and/or later transferred to accounts under his control.

149.    On information and belief, Ilyaich, the Ilyaich Management Companies and the ABC Corporations, through their control, ownership and operation of the Ilyaich PCs became the centerpieces of separate, but nearly identical, schemes to fraudulently bill No-fault insurance carriers for services, which were rendered by fraudulently incorporated and operated professional corporations engaging in unlawful fee-splitting.

150.    On information and belief, each PC was a well-organized illegal enterprise that engaged in systematic and fraudulent practices that distinguish it from legitimate healthcare

providers. For instance, the components of each enterprise followed practices that were part of a

racketeering scheme dictated by Ilyaich:

- Unlike legitimate providers, Ilyaich, through the Ilyaich PCs he operated and controlled, submitted bills to insurers, in general, and Plaintiffs, in particular, that represented that these PCs were professional corporations owned by a medical doctor when, in fact, they were not;

- Unlike legitimate providers, Ilyaich, through the Ilyaich PCs he operated and controlled, made false and misleading statements and/or provided false information regarding who owned, controlled and operated the professional corporation;

- Unlike legitimate providers, Ilyaich, through the Ilyaich PCs made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that these PCs were being operated by McGee, whose name was listed on the certificate of incorporation when, in fact, it was not;

- Unlike legitimate providers, Ilyaich, through the Ilyaich PCs he operated and controlled, made false and misleading statements and/or provided false information intended to circumvent Article 15 of the New York State Business Corporation Law, which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, Ilyaich, through the Ilyaich PCs he operated and controlled, concealed the fact that the PCs were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that they were billing for physician services through fraudulently incorporated PCs;

- Unlike legitimate medical practices, the Ilyaich PCs were fraudulently incorporated in violation of New York State and the No-fault Law;

- Unlike legitimate medical practices, Dr. McGee maintained no operation and control of the Ilyaich PCs, which he purportedly owned;

- Unlike legitimate medical practices, nearly all of the insurance proceeds collected on behalf of the Ilyaich PCs were diverted to Ilyaich, through his management companies, London Billing and/or Sion Marketing;

- Unlike legitimate medical practices, McGee retained no true beneficial ownership in the Ilyaich PCs, which he purported to own; and

- Unlike legitimate medical practices, the Ilyaich PCs split the gross billings with the non-professional, Ilyaich, in violation of the Education Law, Public Health Law, Business Corporation Law and No-fault Law.

151. The members of each enterprise alleged herein played well-defined and essential roles in the respective schemes to defraud and in directing the affairs of the separate enterprises. By way of example and not limitation, in furtherance of the scheme to defraud, Ilyaich:

- Maintained and controlled the bank accounts of the Ilyaich PCs;

- Used the bank accounts to receive payments from Plaintiffs to enrich himself and to pay those involved in his organization including office managers, physicians, physical therapists, chiropractors and support staff for their roles in carrying out the scheme;

- Prepared or caused to be prepared fraudulent bills and sent them to Plaintiffs;

- Participated, or caused those acting under his direction, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

- Ensured that the profits from the criminal enterprise was funneled to himself and his co-conspirators;

- Submitted or caused to be submitted medical reports and bills on behalf of the fraudulently incorporated Ilyaich PCs, which were not entitled to reimbursement under the New York State No-fault Law;

- Submitted or caused to be submitted numerous insurance claims to Plaintiffs during the relevant time period relevant in the Complaint;

- Used the Ilyaich Management Companies interchangeably to ensure that the profits from the criminal enterprise were funneled to himself and his co-conspirators;

- Designated the addresses for payment of bills submitted by the Ilyaich PCs; and

- Maintained exclusive control over the mailing locations to which insurance carriers, in general, and Plaintiffs, in particular, were instructed on the NF-3 forms to remit their payments to the Ilyaich PCs.

### 2.    The Romero Group PCs

152.    The Romero Group is comprised of Defendant Romero, a layperson not licensed to practice any profession in the State of New York, and Defendant Paez, a chiropractor not licensed and/or authorized to operate and own a medical professional corporation,  who purchased and/or otherwise were permitted to use the name and license of McGee, a medical doctor, to fraudulently incorporate and/or otherwise own, control and operate the Romero Group PCs in violation of applicable New York State law and, in furtherance thereof, circumvent Article 15 of the BCL, which prohibits lay person ownership or ownership by a chiropractor of a medical professional corporation, and Article 65 of the Education law, which prohibits fee-splitting.  By doing so, the Romero Group concealed that they are the "true owners" of the Romero Group PCs and fraudulently represented that they were legitimate professional corporations in compliance with core licensing requirements, when in fact they are not.

153.    On information and belief, the Romero Group used MMA, Fresh Meadows, HJR and/or Yellowstone Management (collectively the "Romero Group Management Companies") as the vehicles to operate and control all of the Romero Group PCs' operations and to funnel fraudulently obtained insurance payments to themselves and others unknown to Plaintiffs.

154.    On information and belief, to ensure that ownership and complete control of the Romero Group PCs remained with the Romero Group, the PCs' true owners, the Romero Group caused the Romero Group PCs to enter into one or more oral and/or written agreements with the Romero Group Management Companies, which the Romero Group also controlled and owned.

155.    On information and belief, the Romero Group PCs' billing and collection activities were firmly controlled by the Romero Group and others under his direction, supervision and control.  Through the foregoing PCs, the Romero Group prepared and/or caused

40

to be mailed insurance claim forms in the PC's name(s). The claim forms prepared by the Romero Group and/or those acting under their control directed insurers to mail checks to locations that were designated by them and the proceeds of those claims were either deposited in bank accounts under their control and/or later transferred to accounts under their control.

156. At all relevant times mentioned herein, the Romero Group PCs were medical offices in name only. In fact, the Defendant PCs served as alter egos for the Romero Group, their management companies and/or one or more of the ABC Corporations, and did not adhere to a separate and distinct function or corporate structure that would entitle them to be recognized as legitimate corporate entities. For all practical and legal purposes, the Romero Group PCs were created and used for the sole purpose of defrauding insurers into paying No-fault claims to fraudulently incorporated professional corporations and/or professional corporations that were (a) not licensed in accordance with applicable New York State Law; and (b) engaging in unlawful fee-splitting with non-professionals. By way of example and not limitation, although purportedly separate entities in operation at different times and owned by separate management groups, the Romero Group PCs used the same billing and collection company, London Billing, as nearly all of the other Defendant PCs, including, but not limited to, Queens-Brooklyn Medical, Queens Brooklyn Jewish Medical, Queens Roosevelt Medical, Woodward Medical and Beach Medical. Moreover, although purportedly separate entities, Advanced Medical, Fresh Meadows, Executive Corp. and Sion Marketing, shared a 63-32 99th Street, Rego Park, NY location.

157. On information and belief, the Romero Group, the Romero Group Management Companies and the ABC Corporations, through their control, ownership and operation of the Romero Group PCs, became the centerpieces of separate, but nearly identical, schemes to

fraudulently bill No-fault insurance carriers for services, which were rendered by fraudulently incorporated and operated professional corporations engaging in unlawful fee-splitting.

158.    On information and belief, each PC was a well-organized illegal enterprise that engaged in systematic and fraudulent practices that distinguish it from legitimate healthcare providers. For instance, the components of each enterprise followed practices that were part of a racketeering scheme dictated by the Romero Group:

- Unlike legitimate providers, the Romero Group, through the Romero Group PCs they operated and controlled, submitted bills to insurers, in general, and Plaintiffs, in particular, that represented these Defendant PCs were professional corporations owned by a medical doctor when, in fact, they were not;

- Unlike legitimate providers, the Romero Group, through the Romero Group PCs they operated and controlled, made false and misleading statements and/or provided false information regarding who owned, controlled and operated the professional corporation;

- Unlike legitimate providers, the Romero Group, through the Romero Group PCs, made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that the Romero Group PCs were being operated by McGee, whose name was listed on the certificate of incorporation when, in fact, it was not;

- Unlike legitimate providers, the Romero Group, through the Romero Group PCs they operated and controlled, made false and misleading statements and/or provided false information intended to circumvent Article 15 of the New York State Business Corporation Law, which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, the Romero Group, through the Romero Group PCs they operated and controlled, concealed the fact that these PCs were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that they were billing for physician services through fraudulently incorporated PCs;

- Unlike legitimate medical practices, the Romero Group PCs were fraudulently incorporated in violation of New York State and the No-fault Law;

- Unlike legitimate medical practices, Dr. McGee maintained no operation and control of the Romero Group PCs, which he purportedly owned;

- Unlike legitimate medical practices, nearly all of the insurance proceeds collected on behalf of the Romero Group PCs were diverted to the Romero Group, through their management companies, and/or other entities unknown to Plaintiffs;

- Unlike legitimate medical practices, McGee retained no true beneficial ownership in the Romero Group PCs, which he purported to own; and

- Unlike legitimate medical practices, the Romero Group PCs split the gross billings with the non-professionals, the Romero Group, in violation of the Education Law, Public Health Law, Business Corporation Law and No-fault Law.

159.    The members of each enterprise alleged herein played well-defined and essential roles in the respective schemes to defraud and in directing the affairs of the separate enterprises. By way of example and not limitation, in furtherance of the scheme to defraud, the Romero Group:

- Maintained and controlled the bank accounts of the Romero Group PCs;

- Used the bank accounts to receive payments from Plaintiffs to enrich themselves and to pay those involved in their organization including office managers, physicians, physical therapists, chiropractors and support staff for their roles in carrying out the scheme;

- Prepared or caused to be prepared fraudulent bills and sent them to Plaintiffs;

- Participated, or caused those acting under their direction, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

- Ensured that the profits from their criminal enterprise were funneled to them and their co-conspirators;

- Submitted or caused to be submitted medical reports and bills on behalf of the fraudulently incorporated the Romero Group PCs, which were not entitled to reimbursement under the New York State No-fault Law;

- Submitted or caused to be submitted numerous insurance claims to

43

Plaintiffs during the relevant time period relevant in the Complaint;

- Used the Romero Group Management Companies interchangeably to ensure that the profits from their criminal enterprise were funneled to them and their co-conspirators;

- Designated the addresses for payment of bills submitted by the Romero Group PCs; and

- Maintained exclusive control over the mailing locations to which insurance carriers, in general, and Plaintiffs, in particular, were instructed on the NF-3 forms to remit their payments to the Romero Group PCs.

### 3. The Susi PC

160. Defendant Susi is a licensed chiropractor in the State of New York, who purchased and/or otherwise was permitted to use the name and license of McGee, a medical doctor, to fraudulently incorporate and/or otherwise own, control and operate Defendant PC Beach Medical in violation of applicable New York State law and, in furtherance thereof, circumvent Article 15 of the BCL, which prohibits ownership of a professional corporation by a person who is not licensed and/or authorized to operate and own a medical professional corporation, and Article 65 of the Education law, which prohibits fee-splitting. By doing so, Susi concealed that he is the "true owner" of Defendant PC Beach Medical and fraudulently represented that it was legitimate professional corporations in compliance with core licensing requirements, when in fact it was not.

161. On information and belief, Susi used Alpha Chiropractic as the vehicle to operate and control all of Beach Medical's operations and to funnel fraudulently obtained insurance payments to himself and others unknown to Plaintiffs.

162. On information and belief, to ensure that ownership and complete control of Beach Medical remained with Susi, the PC's true owner, Susi caused Beach Medical to enter into

one or more oral and/or written agreements with Alpha Chiropractic, which Susi also controlled and owned.

163.    On information and belief, Beach Medical's billing and collection activities were firmly controlled by Susi and others under his direction, supervision and control.  Through the foregoing PCs, Susi prepared and/or caused to be mailed insurance claim forms in the PC's name(s).  The claim forms prepared by Susi and/or those acting under his control directed insurers to mail checks to locations that were designated by him and the proceeds of those claims were either deposited in bank accounts under his control and/or later transferred to accounts under his control.

164.    At all relevant times mentioned herein, Beach Medical was a medical office in name only.  In fact, Beach Medical served as an alter ego for Susi, his management company and/or one or more of the ABC Corporations, and did not adhere to a separate and distinct function or corporate structure that would entitle it to be recognized as a legitimate corporate entity.  For all practical and legal purposes, Beach Medical was created and used for the sole purpose of defrauding insurers into paying No-fault claims to fraudulently incorporated professional corporations and/or professional corporations that were (a) not licensed in accordance with applicable New York State Law; and (b) engaging in unlawful fee-splitting with non-professionals.  By way of example and not limitation, although purportedly a separate entity in operation at different times and owned by a separate management group, Beach Medical used the same billing company, London Billing as nearly all of the other Defendant PCs, including, but not limited to, Advanced Medical, Integrated Medical, Yellowstone Medical, Queens-Brooklyn Medical, Queens Brooklyn Jewish Medical, Queens Roosevelt Medical and Woodward Medical.  Moreover, although purportedly separate entities, Beach Medical and its management

company, Alpha Chiropractic, shared the 520 Beach 20th Street, Far Rockaway, NY location.

165.   On information and belief, Susi, Alpha Chiropractic and the ABC Corporations, through their control, ownership and operation of Beach Medical, became the centerpieces of a scheme to fraudulently bill No-fault insurance carriers for services, which were rendered by a fraudulently incorporated and operated professional corporation engaging in unlawful fee-splitting.

166.   On information and belief, Beach Medical was a well-organized illegal enterprise that engaged in systematic and fraudulent practices that distinguish it from legitimate healthcare providers. For instance, the components of the Beach Medical enterprise followed practices that were part of a racketeering scheme dictated Susi:

- Unlike legitimate providers, Susi, through Beach Medical, which he operated controlled, submitted bills to insurers, in general, and Plaintiffs, in particular, that represented that Beach Medical was a professional corporation owned by a medical doctor when, in fact, it was not;

- Unlike legitimate providers, Susi, through Beach Medical, which he operated and controlled, made false and misleading statements and/or provided false information regarding who owned, controlled and operated the professional corporation;

- Unlike legitimate providers, Susi, through Beach Medical, made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that Beach Medical was being operated by McGee, whose name was listed on the certificate of incorporation when, in fact, it was not;

- Unlike legitimate providers, Susi, through Beach Medical, which he operated and controlled, made false and/or misleading statements and/or provided false information intended to circumvent Article 15 of the New York State Business Corporation Law, which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, Susi, through Beach Medical, which he operated and controlled, concealed the fact that the PC was engaged in the illegal corporate practice of medicine in contravention of New York State

46

law, and that he was for physician services through a fraudulently
incorporated PC;

- Unlike legitimate medical practices, Beach Medical was fraudulently
  incorporated in violation of New York State and the No-fault Law;

- Unlike legitimate medical practices, Dr. McGee maintained no operation
  and control of Beach Medical, which he purportedly owned;

- Unlike legitimate medical practices, nearly all of the insurance proceeds
  collected on behalf of Beach Medical was diverted to Susi, through Alpha
  Chiropractic, and/or other entities unknown to Plaintiffs;

- Unlike legitimate medical practices, McGee retained no true beneficial
  ownership in Beach Medical, which he purported to own; and

- Unlike legitimate medical practices, Beach Medical split the gross billings
  with a non-professional, Susi, in violation of the Education Law, Public
  Health Law, Business Corporation Law and No-fault Law.

167.    The members of each enterprise alleged herein played well-defined and essential

roles in the respective schemes to defraud and in directing the affairs of the separate enterprises.

By way of example and not limitation, in furtherance of the scheme to defraud, Susi:

- Maintained and controlled the bank account of Beach Medical;

- Used the bank account to receive payments from Plaintiffs to enrich
  himself and to pay those involved in their organization including office
  managers, physicians, physical therapists, chiropractors and support staff
  for their roles in carrying out the scheme;

- Prepared or caused to be prepared fraudulent bills and sent them to
  Plaintiffs;

- Participated, or caused those acting under his direction, in the preparation
  and mailing of bogus claims, knowing that they contained materially false
  and misleading information;

- Ensured that the profits from the criminal enterprise was funneled to
  himself and his co-conspirators;

- Submitted or caused to be submitted medical reports and bills on behalf of
  the fraudulently incorporated Beach Medical, which was not entitled to
  reimbursement under the New York State No-fault Law;

- Submitted or caused to be submitted numerous insurance claims to Plaintiffs during the relevant time period relevant in the Complaint;

- Used Defendant Alpha Chiropractic to ensure that the profits from the criminal enterprise were funneled to himself and his co-conspirators;

- Designated the addresses for payment of bills submitted by Beach Medical; and

- Maintained exclusive control over the mailing locations to which insurance carriers, in general, and Plaintiffs, in particular, were instructed on the NF-3 forms to remit their payments to Beach.

168.    By way of further example, in furtherance of the separate, but similar, schemes to

defraud alleged herein, McGee:

- Allowed the use of his name and license by the True Owners to fraudulently incorporate the Defendant PCs;

- Provided the essential means through the True Owners were able to own the Defendant PCs in contravention of New York State Law;

- Ceded ownership and control of the Defendant PCs;

- Abdicated any and all attributes of ownership and control to the True Owners;

- Maintained no control over how the Defendant PCs were operated and managed;

- Allowed his name and license to be used to pursue fraudulent claims on behalf of the Defendant PCs -- which were unlawfully formed and operated by Susi; and

- Knew or should have known that the bills and supporting documents submitted to Plaintiffs were on behalf of the Defendant PCs, which were not licensed in accordance with applicable New York State Law; that were imbued with an illegal corporate structure, engaged in unlawful fee-splitting, and not eligible to recover No-fault benefits.

48

## CENTRALIZED SCHEME TO DEFRAUD / MECHANICS OF THE SCHEME TO DEFRAUD

169.    On information and belief, the True Owners conducted their business, affairs and operations through various entities, known and unknown to Plaintiffs.

170.    Though the True Owners attempted to conceal their respective ownership of one or more of the Defendant PCs, they did in fact use McGee as the Paper Owner of the Defendant PCs, over which they exercised control.

171.    From their respective dates of incorporation through the date of the filing of this Complaint, the True Owners hid their respective beneficial ownership in one or more of the Defendant PCs in order to falsely lead No-fault insurance carriers, in general, and the Plaintiffs, in particular, to believe that the Defendant PCs were lawfully incorporated and legitimate professional corporations when in fact they were not.

172.    Defendants also concealed the fact that Ilyaich, the Romero Group and/or Susi were the true beneficial owners and pecuniary beneficiaries of one or more of the Defendant PCs in order to circumvent the Business Corporation Law of New York State, which prohibits individuals who are not licensed to practice medicine from owning professional corporations in the medical field.  Specifically, Section 1507 of the Business Corporation Law of the State of New York permits the ownership of a professional corporation by only those "individuals who are authorized by law to practice in this state [New York] a profession which such corporation is authorized to practice...."

173.    By concealing the fact that Ilyaich, the Romero Group and/or Susi were the true beneficial owners and pecuniary beneficiaries of one or more of the Defendant PCs, Defendants circumvented the restrictions contained in Article 15 of the B.C.L., which are designed to

49

"ensure that a professional service corporation renders professional services only through qualified members of the professions and are in fact controlled only by qualified members." New York Legislative Annual 1970, p. 129 (emphasis added).

174. On information and belief, in furtherance of their respective schemes to defraud, the True Owners determined the terms and/or unilaterally established the manner and means through which the Defendant Management Companies and/or one or more of ABC Corporations purportedly managed the Defendant PCs, as well as the manner and means through which the Defendants London Billing, Sion Marketing and 65-55 Woodhaven Realty, and/or one or more of the XYZ Corporations, facilitated the fraudulent schemes described herein by siphoning off PC funds, disguised as payments for purported services these entities were allegedly providing, which were eventually diverted to the True Owners who profited from the scheme.. As a result, the True Owners controlled and operated every aspect of the Defendant PCs' business, with which they were associated.

175. On information and belief, the fee arrangements under these agreements were set by the True Owners. Pursuant to the arrangements, the monies paid by the Defendant PCs to one or more of the Defendant Management Companies were not pursuant to a set fee or percentage, but increased and/or decreased year to year to ensure that nearly all of the Defendant PCs' gross billings were transferred to one or more of the Defendant Management Companies, and eventually funneled to the True Owners.

176. By way of example and not limitation, on information and belief, the Romero Group caused Advanced Medical to enter into an agreement with MMA through which Advanced Medical was obligated to pay MMA $1,680,000.00 a year for management services, office and facilities equipment and administrative services. Notwithstanding the plain language

50

of the agreement, on information and belief, Advanced Medical paid MMA in excess of $2 million in 2005, $2.2 million in 2006 and $1.9 million in 2007, representing nearly 80% of the PC's total gross receivables in those years.

177.   By way of further example and not limitation, on information in belief, the amounts Queens Brooklyn Jewish paid to Executive Corp. and Alternative Program Queens for purported management and administrative services fluctuated wildly from approximately $459,000 in 2005, $633,000 in 2008, to $761,000 in 2009, representing 71% to 99% of the PCs' total gross receivables in those years.

178.   On information and belief, the money funneled by the True Owners through one or more of the Defendant Management Companies constituted and reflected profits of the separate criminal enterprises alleged herein.

179.   On information and belief, under the separate arrangements between McGee and the True Owners, McGee's salary and/or other compensation from the Defendant PCs, which was established by the True Owners, was erratic to the extent that in several years McGee received little or no compensation from his alleged PCs, while the Defendant Management Companies and London Billing, Sion Marketing and/or 65-55 Woodhaven Realty received substantial portions of the total gross receivables.

180.   In that regard, on information and belief, McGee's compensation did not change based on the revenue that was generated, or expenses incurred, by the Defendant PCs, but rather fluctuated regardless of the financial condition or profitability of any of the Defendant PCs at the whim of the True Owners. As a result, McGee did not have an ownership or pecuniary interest in the profits of the businesses that he purportedly owned.

51

181.    On information and belief, the Defendant PCs provided the vehicle through which the True Owners were able to engage in separate, but substantially similar, billing schemes premised entirely on their respective ability to pass millions of dollars through fraudulently incorporated professional corporations.

### A.    The Ilyaich PCs Scheme to Defraud

182.    On information and belief, Ilyaich created Alternative Program Queens, Executive Corp., JBL Management and one or more of the ABC Corporations, which served as alter egos for the purpose of concealing that Ilyaich was the true, beneficial owner of the Ilyaich PCs.

183.    On information and belief, Ilyaich provided all start-up costs and investment in the Ilyaich PCs. McGee did not incur any costs to establish the Ilyaich PCs, nor invested any money in the practices he purportedly owned.

184.    On information and belief, Ilyaich managed, supervised, participated in, conducted and oversaw the day-to-day billing and operations of the Ilyaich PCs.

185.    On information and belief, London Billing and Sion Marketing were owned and/or controlled by Ilyaich, who is also the owner of the Ilyaich Management Companies that engaged them to perform services on the PCs' behalf.  In that regard, Ilyaich funneled the illicit proceeds of the fraud to himself (and others).  By way of example, Defendant Simon Ilyaich is listed on public records maintained by the New York Department of State and database searches as the owner of the Ilyaich Management Companies.  According to public records maintained by the New York Department of State, Defendant Simon Ilyaich is an owner and/or officer of London Billing and Sion Marketing, corporations established to funnel money from Advanced Medical, Integrated Medical, Queens-Brooklyn Medical, Queens Brooklyn Jewish Medical,

Queens Roosevelt Medical, Woodward Medical and Beach Medical, to Ilyaich, his co-conspirators and others unknown to Plaintiffs.

186. On information and belief, to avoid suspicion and detection by insurance companies, Ilyaich would incorporate a new PC and phase out an old one that would bill from the same address or start billing under the name of another Defendant PC purportedly providing services at a different address. By way of example, Queens Brooklyn Jewish Medical and was the successor to Queens-Brooklyn Medical, both which were controlled by Ilyaich, operated out of the same address and were purportedly owned by McGee.

187. On information and belief, Ilyaich further exercised control over the Ilyaich PCs through the Ilyaich Management Companies and/or one or more of the ABC Corporations by, among other things:

- Causing the Ilyaich PCs to enter into management, billing, equipment and/or other service agreements all for the purpose of diverting insurance payments received by those PCs to Ilyaich, through the Ilyaich Management Companies and/or one or more of the ABC Corporations, entities he owned and controlled, and for the purpose of engaging in illegal fee-splitting;

- Retaining lawyers to represent the Ilyaich PCs and preparation of all paperwork for lawsuits and/or arbitration proceedings seeking to collect payment for medical services purportedly provided by those PCs;

- Making personnel decisions on behalf of the Ilyaich PCs, including hiring medical personnel and support staff and establishing their salaries;

- Managing, operating and supervising the affairs of the Ilyaich PCs;

- Managing and supervising the support staff operating out of the office space for the Ilyaich PCs;

- Preparing and generating medical records and bills for submission to insurers that fraudulently represented that the services were rendered by properly licensed providers of healthcare services when in fact they were not;

- Negotiating settlements with insurance carriers on behalf of the Ilyaich PCs;

- Falsifying information contained in the New York State NF-3 forms submitted by the Ilyaich PCs to No-fault insurance carriers, in general, and Plaintiffs, in particular, and by preparing fraudulent supporting documentation;

- Establishing the office locations for the Ilyaich PCs;

- Establishing, supervising and controlling the payroll of the Ilyaich PCs;

- Establishing, supervising and controlling the finances and bank accounts of the Ilyaich PCs; including issuing and/or causing to be issued checks and disbursements out of the bank accounts of those PCs.

- Diverting in excess of $5,500,000.00 in fraudulently obtained insurance payments made to the Ilyaich PCs to the Ilyaich Management Companies, which he owned and controlled;

- Causing Queens-Brooklyn Medical to pay fees in excess of $5,100,000.00 from 2001 through 2008 to Defendants Alternative Program Queens, Executive Corp, JBL Management, London Billing and Sion Marketing, entities he owned, while McGee received approximately $1,400,000.00 during the same time period;

- Siphoning in excess of $2,700,000.00 in management fees from Queens Brooklyn Jewish Medical from 2004 through 2009, representing nearly 80% of the total gross receipts for the PC.

**B.    The Romero Group PCs Scheme to Defraud**

188.    On information and belief, the Romero Group created the Romero Group Management Companies and one or more of the ABC Corporations, which served as alter egos for the purpose of concealing that the Romero Group were the true, beneficial owners of the Romero Group PCs.

189.    On information and belief, the Romero Group provided all start-up costs and investment in the Romero Group PCs. McGee did not incur any costs to establish the Romero Group PCs, nor invested any money in the practices he purportedly owned.

190.    On information and belief, as part of the scheme to defraud, the Romero Group, through the Romero Group Management Companies and/or one or more of the ABC Corporations, operated, controlled and managed the Romero Group PCs, and employed

personnel who were responsible for creating and generating their fraudulent bills, medical records and No-fault forms to be submitted to insurance carriers.

191.   On information and belief, the Romero Group managed, supervised, participated in, conducted and oversaw the day-to-day billing and operations of the Romero Group PCs.

192.   On information and belief, 65-55 Woodhaven Realty was owned and/or controlled by Romero, and provided the office space where Yellowstone Medical maintained its operations. By way of example and not limitation, Defendant Humberto Romero is listed on public records maintained by the New York Department of State and database searches as the owner of Yellowstone Management.   According to public records maintained by the New York Department of State, Defendant Humberto Romero is also an owner and/or officer of 65-55 Woodhaven Realty, which is a company established to funnel money from Yellowstone Medical to Romero  and others unknown to Plaintiffs.

193.   On information and belief, to avoid suspicion and detection by insurance companies, Romero would incorporate a new PC and phase out an old one that would bill from the same address or start billing under the name of another Defendant PC purportedly providing services at a different address.  By way of example, Integrated Medical replaced and was the successor to Advanced Medical, both of which were controlled by Romero and both entities operated out of the same address.

194.   On information and belief, the Romero Group further exercised control over the Romero Group PCs through the Romero Group Management Companies and/or one or more of the ABC Corporations by, among other things:

- Causing the Romero Group PCs to enter into management, billing, equipment and/or other service agreements all for the purpose of diverting insurance payments received by those PCs to the Romero Group, through the Romero Group Management Companies and/or one

or more of the ABC Corporations, entities they owned and controlled, and for the purpose of engaging in illegal fee-splitting;

- Retaining lawyers to represent the Romero Group PCs and preparation of all paperwork for lawsuits and/or arbitration proceedings seeking to collect payment for medical services purportedly provided by those PCs;

- Making personnel decisions on behalf of the Romero Group PCs, including hiring medical personnel and support staff and establishing their salaries;

- Managing, operating and supervising the affairs of the Romero Group PCs;

- Managing and supervising the support staff operating out of the office space of the Romero Group PCs;

- Preparing and generating medical records and bills for submission to insurers that fraudulently represented that the services were rendered by properly licensed providers of healthcare services when in fact they were not;

- Negotiating settlements with insurance carriers on behalf of the Romero Group PCs;

- Falsifying information contained in the New York State NF-3 forms submitted by the Romero Group PCs to No-fault insurance carriers, in general, and Plaintiffs, in particular, and by preparing fraudulent supporting documentation;

- Establishing the office locations for the Romero Group PCs;

- Establishing, supervising and controlling the payroll of the Romero Group PCs;

- Establishing, supervising and controlling the finances and bank accounts of the Romero Group PCs; including issuing and/or causing to be issued checks and disbursements out of the bank accounts of those PCs.

- Diverting in excess of $9,000,000.00 from 2006 through 2009 in fraudulently obtained insurance payments made to the Romero Group PCs, to the Romero Group Management Companies, which they owned and controlled;

- Causing Advanced Medical to pay fees in excess of $11,000,000.00 from 2001 through 2008 to the Romero Group Management Companies, while McGee received approximately $340,000.00 during the same time period;

- Siphoning in excess of $2,400,000.00 in management fees from Integrated Medical from 2006 through 2009, representing nearly 70% of the total gross receipts for the PC; and

- Siphoning in excess of $685,000.00 in management fees from Yellowstone in 2007 and 2009, representing nearly 50% of the total gross receipts for the PC.

## C.     The Susi PC Scheme to Defraud

195.    On information and belief, Susi created Alpha Chiropractic, which served as an alter ego for the purpose of concealing that Susi was the true, beneficial owner of Beach Medical.

196.    On information and belief, Susi provided all start-up costs and investment in Beach Medical. McGee did not incur any costs to establish Beach Medical, nor invested any money in the practice he purportedly owned.

197.    On information and belief, as part of the scheme to defraud, Susi, through Alpha Chiropractic, operated, controlled and managed Beach Medical, and employed personnel who were responsible for creating and generating their fraudulent bills, medical records and No-fault forms to be submitted to insurance carriers.

198.    On information and belief, Susi, supervised, participated in, conducted and oversaw the day-to-day billing and operations of Beach Medical.

199.    On information and belief, Susi further exercised control over Beach Medical individually and/or through one or more of the ABC Corporations by, among other things:

- Causing Beach Medical to enter into management, billing, equipment and/or other service agreements all for the purpose of diverting insurance payments received by those PCs to Susi, through Alpha Chiropractic, entities he owned and controlled, and for the purpose of engaging in illegal fee-splitting;

57

- Retaining lawyers to represent Beach Medical and preparation of all paperwork for lawsuits and/or arbitration proceedings seeking to collect payment for medical services purportedly provided by the PC;

- Making personnel decisions on behalf of Beach Medical, including hiring medical personnel and support staff and establishing their salaries;

- Managing, operating and supervising the affairs of Beach Medical;

- Managing and supervising the support staff operating out of the office space of Beach Medical;

- Preparing and generating medical records and bills for submission to insurers that fraudulently represented that the services were rendered by a properly licensed provider of healthcare services when in fact they were not;

- Negotiating settlements with insurance carriers on behalf of Beach Medical;

- Falsifying information contained in the New York State NF-3 forms submitted by Beach Medical to No-fault insurance carriers, in general, and Plaintiffs, in particular, and by preparing fraudulent supporting documentation;

- Establishing the office locations for Beach Medical;

- Establishing, supervising and controlling the payroll of Beach Medical;

- Establishing, supervising and controlling the finances and bank accounts of Beach Medical; including issuing and/or causing to be issued checks and disbursements out of the bank accounts of the PC; and

- Siphoning in excess of $730,000.00 in management and billing fees from Beach Medical from 2004 through 2008, while bank records show that McGee received only $60,000.00 from the PC.

### D.   McGee's Role in the Schemes To Defraud

200.   On information and belief, by way of further example and not limitation that McGee exercised no control over any of the Defendant PCs set forth in the schemes to defraud above, McGee did not:

- Maintain a physical presence at the Defendant PCs;

- Supervise the activities of the Defendant PCs' practice;

58

- Control the Defendant PCs' money and other assets;

- Contribute any capital to the Defendant PCs;

- Negotiate any lease agreements relating to the physical premises and equipment for the Defendant PCs;

- Have access to any corporate books, bank accounts, financial or business ledgers, or other related documents;

- Receive any profits or percentage of profit, revenue or other income from the Defendant PCs, except for his "salary";

- Receive any profits, distributions or dividends;

- Receive any type of written daily, weekly, monthly or annual accounting or financial ledger or accounts receivable report of the PCs' account receivables;

- Receive any type of written daily, weekly, monthly or annual accounting or financial ledger of the PCs' cash receipts;

- Receive any type of written daily, weekly, monthly or annual accounting of receipts and disbursements;

- Manage the daily operations of the Defendant PCs' business;

- Hire any employees, professional or non-professional;

- Purchase, lease, select, order, arrange to maintain or repair any of the equipment housed at any of the Defendant PC locations;

- Know the costs associated with the services the Defendant PCs were supposed to receive from the Defendant Management Companies; and

- Know the terms of the agreements between any of the Defendant PCs and the billing and collection services "retained" for his Defendant PCs or the cost and/or amount paid for such services.

201. On information and belief, through the fraudulent schemes described above, the True Owners purchased the right to use the name and license of McGee for the purpose of submitting claims to No-fault carriers, in general, and Plaintiffs, in particular for services

provided by fraudulently incorporated professional corporations that are not entitled to reimbursement under New York State Law.

## DISCOVERY OF THE FRAUD

202.    On information and belief, to induce Plaintiffs to promptly reimburse their claims, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example, and not limitation:

- From the time the Defendant PCs were incorporated, the True Owners hid their beneficial ownership of one or more of the Defendants PCs in order to falsely lead No-fault insurance carriers, in general, and the Plaintiffs, in particular, into believing that the Defendant PCs were lawfully incorporated and legitimate professional corporations in order to induce the insurers to make payments to the Defendant PCs to which they were not entitled under New York law.

- From the time the Defendant PCs were incorporated, the True Owners caused one or more of the Defendant PCs to enter into the purported written and/or oral billing management agreements with one or more Management Companies and/or other entities, in order to siphon off nearly all of the insurance payments received by the Defendant PCs to the True Owners and/or others unknown to Plaintiffs, through one or more of the Management Companies and/or other entities they owned and controlled.

- From the time the Defendant PCs were incorporated, McGee allowed the use of his name and license by the True Owners, permitting them to own, control and operate that in which they are prohibited by law from maintaining a financial interest in, to wit: professional corporations that must be owned exclusively by a licensed professional or like professionals acting within the scope of the professional corporation's authorized practice.  By selling his name and/or the use of his license for a fee and/or other compensation to the True Owners, McGee provided the essential means for the True Owners to fraudulently incorporate and/or operate the Defendant PCs and/or fraudulently bill for purported medical services through the Defendant PCs in violation of applicable New York State Law.

- From the time the Defendant PCs were incorporated, the True Owners, through their Management Companies, entered into agreements with one or more of London Billing, Sion Marketing and/or 65-55 Woodhaven Realty through which one or more of the True Owners would further conceal the profits of the fraudulent scheme by diverting portions of the payments made by insurers to London Billing, Sion Marketing and/or 65-55 Woodhaven Realty.  In reality, the payments were only a means to further distance one or more of the True Owners and their co-conspirators

60

from the profits scheme and to ensure that the profits were funneled to them and/or others unknown to Plaintiffs.

203.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days.   The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $2.3 million based upon the fraudulent bill submissions.

204.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud, described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed their complaint.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

**AGAINST ILYAICH, BABADZHANOVA, M. ILYAICH, MCGEE, EXECUTIVE CORP., JBL MANAGEMENT, ALTERNATIVE PROGRAM QUEENS, LONDON BILLING, SION MARKETING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

#### (RICO, pursuant to 18 U.S.C § 1962(c))

205.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

206.    At all times relevant herein, Queens-Brooklyn Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

207.     From in or about 1998 through the date of the filing of this Complaint, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the affairs of the Queens-Brooklyn Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this complaint, all of which are incorporated by reference.   Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

208.     Defendant Ilyaich, at all relevant times, was the principal of, exerted control over, and directed the operations of the Queens-Brooklyn Medical enterprise and each of its component parts.  Defendant Ilyaich utilized that control to conduct the affairs of the Queens-Brooklyn Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately fourteen years.

209.     Defendants Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Queens-Brooklyn Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

210.     The general business corporations (Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, ABC and XYZ Corporations) that are named as Defendants were associated with the Queens-Brooklyn Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

211.     On information and belief, Defendants Executive Corp., JBL Management,

Alternative Program Queens, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Queens-Brooklyn Medical, and collected the proceeds of those claims.

212. On information and belief, McGee furnished his name and professional license to the Queens-Brooklyn Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

213. On information and belief, the remaining XYZ corporate entities, on behalf of Queens-Brooklyn Medical, participated in and conducted the affairs of the Queens-Brooklyn Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

214. As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiff Allstate Insurance Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

215. The racketeering acts set forth herein were carried out on a continued basis over a thirteen-year period, were related and similar and were committed as part of Defendants' (Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently

incorporated professional corporation, and, if not stopped, such acts will continue into the future.

216.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Queens-Brooklyn Medical continues to pursue collection on the fraudulent bills to the present day.

217.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Ilyaich, with the knowledge and intent of Babadzhanova, M. Ilyaich, McGee, Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Insurance Company and to induce it to issue checks to the Queens-Brooklyn Medical enterprise based upon materially false and misleading information.

218.    Through the Queens-Brooklyn Medical enterprise, Defendants Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiff Allstate Insurance Company made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud,

64

extending from the formation of the Queens-Brooklyn Medical enterprise through the filing of this complaint.

219.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

220.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

221.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

222.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Insurance Company has been injured in its business and property and it has been damaged in the aggregate amount presently in excess of $25,000.00, the exact amount to be determined at trial.

223.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Insurance Company is entitled to recover from Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., JBL Management, Alternative Program Queens, London Billing, Sion Marketing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST ILYAICH, BABADZHANOVA, M. ILYAICH, MCGEE, EXECUTIVE CORP., ALTERNATIVE PROGRAM QUEENS, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C § 1962(c))

224.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

225.    At all times relevant herein, Queens Brooklyn Jewish Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

226.    From in or about 2003 through the date of the filing of this Complaint, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., Alternative Program Queens, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the affairs of the Queens Brooklyn Jewish Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

227.    Defendant Ilyaich, at all relevant times, was the principal of, exerted control over, and directed the operations of the Queens Brooklyn Jewish Medical enterprise and each of its component parts.  Defendant Ilyaich utilized that control to conduct the affairs of the Queens

66

Brooklyn Jewish Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately nine years.

228. Defendants Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Queens Brooklyn Jewish Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

229. The general business corporations (Executive Corp., Alternative Program Queens, London Billing, ABC and XYZ Corporations) that are named as Defendants were associated with the Queens Brooklyn Jewish Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

230. On information and belief, Defendants Executive Corp., Alternative Program Queens, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Queens Brooklyn Jewish Medical, and collected the proceeds of those claims.

231. On information and belief, McGee furnished his name and professional license to the Queens Brooklyn Jewish Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

232. On information and belief, the remaining XYZ corporate entities, on behalf of Queens Brooklyn Jewish Medical, participated in and conducted the affairs of the Queens Brooklyn Jewish Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

233. As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles

in the organization, to achieve the common goal of defrauding Plaintiff Allstate Property & Casualty Insurance Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

234.    The racketeering acts set forth herein were carried out on a continued basis over a nine-year period, were related and similar and were committed as part of Defendants' (Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., Alternative Program Queens, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

235.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Queens Brooklyn Jewish Medical continues to pursue collection on the fraudulent bills to the present day.

236.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Ilyaich, with the knowledge and intent of Babadzhanova, M. Ilyaich, McGee, Executive Corp., Alternative Program Queens, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Property & Casualty Insurance Company and to induce it to issue checks to the Queens Brooklyn Jewish Medical enterprise based upon materially false and misleading information.

237. Through the Queens Brooklyn Jewish Medical enterprise, Defendants Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiff Allstate Property & Casualty Insurance Company made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., Alternative Program Queens, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Queens-Brooklyn Jewish Medical enterprise through the filing of this complaint.

238. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

239. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

240. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

241. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Property & Casualty Insurance Company has been injured in their business and property and it

has been damaged in the aggregate amount presently in excess of $9,000.00, the exact amount to be determined at trial.

242.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Property & Casualty Insurance Company is entitled to recover from Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, Executive Corp., Alternative Program Queens, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

### AGAINST ILYAICH, BABADZHANOVA, M. ILYAICH, MCGEE, JBL MANAGEMENT, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C § 1962(c))

243.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

244.    At all times relevant herein, Queens-Roosevelt Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

245.    From in or about 2004 through the date of the filing of this Complaint, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, JBL Management, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the

affairs of the Queens-Roosevelt Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

246.    Defendant Ilyaich, at all relevant times, was the principal of, exerted control over, and directed the operations of the Queens-Roosevelt Medical enterprise and each of its component parts. Defendant Ilyaich utilized that control to conduct the affairs of the Queens-Roosevelt Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately eight years.

247.    Defendants Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Queens-Roosevelt Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

248.    The general business corporations (JBL Management, London Billing, ABC and XYZ Corporations) that are named as Defendants were associated with the Queens-Roosevelt Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

249.    On information and belief, Defendants JBL Management, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Queens-Roosevelt Medical, and collected the proceeds of those claims.

250.    On information and belief, Defendant McGee furnished his name and professional license to the Queens-Roosevelt Medical enterprise and provided the essential means for the

enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

251.     On information and belief, the remaining XYZ corporate entities, on behalf of Queens-Roosevelt Medical, participated in and conducted the affairs of the Queens-Roosevelt Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the PC Defendant's behalf.

252.     As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiff Allstate Insurance Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

253.     The racketeering acts set forth herein were carried out on a continued basis over an eight-year period, were related and similar and were committed as part of Defendants' (Ilyaich, Babadzhanova, M. Ilyaich, McGee, JBL Management, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

254.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Queens-Roosevelt Medical continues to pursue collection on the fraudulent bills to the present day.

255.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Ilyaich, with the knowledge

72

and intent of Babadzhanova, M. Ilyaich, McGee, JBL Management, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Insurance Company and to induce it to issue checks to the Queens-Roosevelt Medical enterprise based upon materially false and misleading information.

256. Through the Queens-Roosevelt Medical enterprise, Defendants Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiff Allstate Insurance Company made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, JBL Management, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Queens-Roosevelt Medical enterprise through the filing of this Complaint.

257. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

258. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §

73

1961(1)(b).

259.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

260.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Insurance Company has been injured in its business and property and it has been damaged in the aggregate amount presently in excess of $2,000.00, the exact amount to be determined at trial.

261.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Insurance Company is entitled to recover from Defendants Ilyaich, Babadzhanova, M. Ilyaich, McGee, JBL Management, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### AGAINST ROMERO, PAEZ, ILYAICH, BABADZHANOVA, M. ILYAICH, MCGEE, MMA, FRESH MEADOWS, HJR, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

(RICO, pursuant to 18 U.S.C § 1962(c))

262.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

263.    At all times relevant herein, Advanced Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

264. From in or about 2001 through the date of the filing of this Complaint, Defendants Romero, Paez, Ilyaich, Babadzhanova, M. Ilyaich, McGee, MMA, Fresh Meadows, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the affairs of the Advanced Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

265. Defendants Romero and Paez, at all relevant times, were the principals of, exerted control over, and directed the operations of the Advanced Medical enterprise and each of its component parts. Defendants Romero and Paez utilized that control to conduct the affairs of the Advanced Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately eleven years.

266. Defendants Ilyaich, Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Advanced Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

267. The general business corporations (MMA, Fresh Meadows, HJR, London Billing, ABC and XYZ Corporations) that are named as Defendants were associated with the Advanced Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

268. On information and belief, Defendants MMA, Fresh Meadows, HJR, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared

fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Advanced Medical, and collected the proceeds of those claims.

269. On information and belief, McGee furnished his name and professional license to the Advanced Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

270. On information and belief, the remaining XYZ corporate entities, on behalf of Advanced Medical, participated in and conducted the affairs of the Advanced Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

271. As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs Allstate Insurance Company and Allstate Indemnity Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

272. The racketeering acts set forth herein were carried out on a continued basis over an eleven-year period, were related and similar and were committed as part of Defendants' (Romero, Paez, Ilyaich, Babadzhanova, M. Ilyaich, McGee, MMA, Fresh Meadows, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

273. On information and belief, this pattern of racketeering activity poses a specific

threat of repetition extending indefinitely into the future, inasmuch as Advanced Medical continues to pursue collection on the fraudulent bills to the present day.

274.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Romero and Paez, with the knowledge and intent of Ilyaich, Babadzhanova, M. Ilyaich, McGee, MMA, Fresh Meadows, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs Allstate Insurance Company and Allstate Indemnity Company and to induce them to issue checks to the Advanced Medical enterprise based upon materially false and misleading information.

275.    Through the Advanced Medical enterprise, Defendants Romero, Paez, Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Romero, Paez, Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiffs Allstate Insurance Company and Allstate Indemnity Company made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Romero, Paez, Ilyaich, Babadzhanova, M. Ilyaich, McGee, MMA, Fresh Meadows, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Advanced Medical enterprise through the filing of this Complaint.

276.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Romero, Paez, Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

277.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

278.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

279.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Indemnity Company have been injured in their business and property and they have been damaged in the aggregate amount presently in excess of $52,000.00, the exact amount to be determined at trial.

280.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company and Allstate Indemnity Company are entitled to recover from Defendants Romero, Paez, Ilyaich, Babadzhanova, M. Ilyaich, McGee, MMA, Fresh Meadows, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

## AGAINST ROMERO, ILYAICH, BABADZHANOVA, M. ILYAICH, MCGEE, HJR, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

(RICO, pursuant to 18 U.S.C § 1962(c))

281.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

282.    At all times relevant herein, Integrated Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

283.    From in or about 2005 through the date of the filing of this Complaint, Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, McGee, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the affairs of the Integrated Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

284.    Defendant Romero, at all relevant times, was the principal of, exerted control over, and directed the operations of the Integrated Medical enterprise and each of its component parts. Defendant Romero utilized that control to conduct the affairs of the Integrated Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail

fraud over a period of approximately seven years.

285. Defendants Ilyaich, Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Integrated Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

286. The general business corporations (HJR, London Billing, ABC and XYZ Corporations) that are named as Defendants were associated with the Integrated Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

287. On information and belief, Defendants HJR, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Integrated Medical, and collected the proceeds of those claims.

288. On information and belief, McGee furnished his name and professional license to the Integrated Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

289. On information and belief, the remaining XYZ corporate entities, on behalf of Integrated Medical, participated in and conducted the affairs of the Integrated Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

290. As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company into paying bills for medical services that were not

supplied and/or of no diagnostic and/or treatment value.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

291.    The racketeering acts set forth herein were carried out on a continued basis over a seven-year period, were related and similar and were committed as part of Defendants' (Romero, Ilyaich, Babadzhanova, M. Ilyaich, McGee, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

292.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Integrated Medical continues to pursue collection on the fraudulent bills to the present day.

293.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Romero, with the knowledge and intent of Ilyaich, Babadzhanova, M. Ilyaich, McGee, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company and to induce them to issue checks to the Integrated Medical enterprise based upon materially false and misleading information.

294.    Through the Integrated Medical enterprise, Defendants Romero, Ilyaich,

81

Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Romero, Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, McGee, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Integrated Medical enterprise through the filing of this Complaint.

295.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Romero, Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

296.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

297.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

298.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company have been injured in their business

and property and they have been damaged in the aggregate amount presently in excess of $422,000.00, the exact amount to be determined at trial.

299.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company are entitled to recover from Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, McGee, HJR, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**

**AGAINST ROMERO, ILYAICH, BABADZHANOVA, M. ILYAICH, MOSHE, MCGEE, YELLOWSTONE MEDICAL, LONDON BILLING, 65-55 WOODHAVEN REALTY, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

(RICO, pursuant to 18 U.S.C § 1962(c))

300.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

301.    At all times relevant herein, Yellowstone Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

302.    From in or about 2007 through the date of the filing of this Complaint, Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, Moshe, McGee, Yellowstone Management, London Billing, 65-55 Woodhaven Realty, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John

83

Does 1 through 20 knowingly conducted and participated in the affairs of the Yellowstone Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

303.    Defendant Romero, at all relevant times, was the principal of, exerted control over, and directed the operations of the Yellowstone Medical enterprise and each of its component parts. Defendant Romero utilized that control to conduct the affairs of the Yellowstone Medical enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately five years.

304.    Defendants Ilyaich, Babadzhanova, M. Ilyaich, Moshe and John Does 1 through 20 were employed by or associated with the Yellowstone Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

305.    The general business corporations (Yellowstone Management, London Billing, 65-55 Woodhaven Realty, ABC and XYZ Corporations) that are named as Defendants were associated with the Yellowstone Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

306.    On information and belief, Defendants Yellowstone Management, London Billing, 65-55 Woodhaven Realty and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Yellowstone Medical, and collected the proceeds of those claims.

307.    On information and belief, McGee furnished his name and professional license to

84

the Yellowstone Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

308.    On information and belief, the remaining XYZ corporate entities, on behalf of Yellowstone Medical, participated in and conducted the affairs of the Yellowstone Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

309.    As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company and Allstate Fire & Casualty Insurance Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

310.    The racketeering acts set forth herein were carried out on a continued basis over a seven-year period, were related and similar and were committed as part of Defendants' (Romero, Ilyaich, Babadzhanova, M. Ilyaich, Moshe, McGee, Yellowstone Management, London Billing, 65-55 Woodhaven Realty, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

311.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Yellowstone Medical

continues to pursue collection on the fraudulent bills to the present day.

312.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Romero, with the knowledge and intent of Ilyaich, Babadzhanova, M. Ilyaich, Moshe, McGee, Yellowstone Management, London Billing, 65-55 Woodhaven Realty, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company and Allstate Fire & Casualty Insurance Company and to induce them to issue checks to the Yellowstone Medical enterprise based upon materially false and misleading information.

313.    Through the Yellowstone Medical enterprise, Defendants Romero, Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Romero, Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company and Allstate Fire & Casualty Insurance Company made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, Moshe, McGee, Yellowstone Management, London Billing, 65-55 Woodhaven Realty, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John

Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Yellowstone Medical enterprise through the filing of this Complaint.

314.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Romero, Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

315.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

316.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

317.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company and Allstate Fire & Casualty Insurance Company have been injured in their business and property and they have been damaged in the aggregate amount presently in excess of $539,000.00, the exact amount to be determined at trial.

318.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company and Allstate Fire & Casualty Insurance Company are entitled to recover from Defendants Romero, Ilyaich, Babadzhanova, M. Ilyaich, McGee, Yellowstone Management, London Billing, 65-55 Woodhaven Realty, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by them, together with the

costs of this lawsuit and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

### AGAINST SUSI, MCGEE, ALPHA CHIROPRACTIC, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20, XYZ CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

(RICO, pursuant to 18 U.S.C § 1962(c))

319.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

320.    At all times relevant herein, Beach Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

321.    From in or about 1998 through the date of the filing of this Complaint, Defendants Susi, Ilyaich, Babadzhanova, M. Ilyaich, McGee, Alpha Chiropractic, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 knowingly conducted and participated in the affairs of the Beach Medical enterprise, as that term is defined in 18 U.S.C. § 1961(4), through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

322.    Defendant Susi, at all relevant times, was the principal of, exerted control over, and directed the operations of the Beach Medical enterprise and each of its component parts. Defendant Susi utilized that control to conduct the affairs of the Beach Medical enterprise

through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately eight years.

323. Defendants Ilyaich, Babadzhanova, M. Ilyaich, and John Does 1 through 20 were employed by or associated with the Beach Medical enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

324. The general business corporations (Alpha Chiropractic, London Billing, ABC and XYZ Corporations) that are named as Defendants were associated with the Beach Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

325. On information and belief, Defendants Alpha Chiropractic, London Billing and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of one or more of the Defendant PCs, including and on behalf of Beach Medical, and collected the proceeds of those claims.

326. On information and belief, McGee furnished his name and professional license to the Beach Medical enterprise and provided the essential means for the enterprise to fraudulently incorporate the bogus professional service corporation and fraudulently bill insurance companies.

327. On information and belief, the remaining XYZ corporate entities, on behalf of Beach Medical, participated in and conducted the affairs of the Beach Medical enterprise, including concealing Defendants' scheme to defraud and receiving money for purported services provided on the Defendant PC's behalf.

328. As a whole, these defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Property &

Casualty Insurance Company into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

329.   The racketeering acts set forth herein were carried out on a continued basis over an eight-year period, were related and similar and were committed as part of Defendants' (Susi, Ilyaich, Babadzhanova, M. Ilyaich, McGee, Alpha Chiropractic, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20) ongoing scheme to fraudulently bill insurers through a fraudulently incorporated professional corporation, and, if not stopped, such acts will continue into the future.

330.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Beach Medical continues to pursue collection on the fraudulent bills to the present day.

331.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Susi, with the knowledge and intent of Ilyaich, Babadzhanova, M. Ilyaich, McGee, Alpha Chiropractic, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Property & Casualty Insurance Company and to induce them to issue checks to the Beach Medical enterprise based upon materially false and misleading information.

332. Through the Beach Medical enterprise, Defendants Susi, Ilyaich, Babadzhanova and M. Ilyaich, submitted or caused to be submitted thousands of fraudulent claim forms seeking payment medical services provided to thousands of No-fault Claimants. The bills and supporting documents that were sent by Defendants Susi, Ilyaich, Babadzhanova and M. Ilyaich, as well as the payments that Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Property & Casualty Insurance Company made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Susi, Ilyaich, Babadzhanova, M. Ilyaich, McGee, Alpha Chiropractic, London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Beach Medical enterprise through the filing of this complaint.

333. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Susi, Ilyaich, Babadzhanova and M. Ilyaich in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

334. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

335. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

336. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey

Property & Casualty Insurance Company have been injured in their business and property and they have been damaged in the aggregate amount presently in excess of $62,000.00, the exact amount to be determined at trial.

337.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Property & Casualty Insurance Company are entitled to recover from Defendants Susi, Ilyaich, Babadzhanova, M. Ilyaich, McGee, Alpha Chiropractic,  London Billing, one or more of the ABC Corporations 1 through 20, one or more of the XYZ Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### AGAINST ILYAICH, ROMERO, PAEZ, SUSI, BABADZHANOVA, M. ILYAICH, MCGEE, QUEENS-BROOKLYN MEDICAL, QUEENS JEWISH MEDICAL, QUEENS-ROOSEVELT MEDICAL, WOODWARD MEDICAL, ADVANCED MEDICAL, INTEGRATED MEDICAL, YELLOWSTONE MEDICAL, BEACH MEDICAL, EXECUTIVE CORP., ALTERNATIVE PROGRAM QUEENS, JBL, FRESH MEADOWS, MMA, HJR, YELLOWSTONE MANAGEMENT,  ALPHA CHIROPRACTIC, LONDON BILLING, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

#### (Common Law Fraud)
#### (Fraudulent Incorporation of the Defendant PCs)

338.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

339.    Defendants Ilyaich, Romero, Paez, Susi, Babadzhanova, M. Ilyaich, McGee, Queens-Brooklyn Medical, Queens Jewish Medical, Queens-Roosevelt Medical, Woodward Medical, Advanced Medical, Integrated Medical, Yellowstone Medical, Beach Medical, Executive Corp., Alternative Program Queens, JBL, Fresh Meadows, MMA, HJR,

Yellowstone Management, Alpha Chiropractic, London Billing, ABC Corporations 1 Through 20 and John Does 1 Through 20 intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made various misleading statements intended to hold out the Defendant PCs as legal professional service corporations in compliance with core licensing requirements when in fact they are not, thereby inducing Plaintiffs to make payments that Defendants were not entitled to because of their fraudulent incorporation, illegal fee-splitting and/or illegal corporate structure that rendered the Defendants PCs not licensed in accordance with applicable New York State Law. As part of the fraudulent scheme implemented by Defendants, the Defendant PCs, with the assistance and knowledge of Defendants Ilyaich, Romero, Paez, Susi, Babadzhanova, M. Ilyaich, Executive Corp., Alternative Program Queens, JBL, Fresh Meadows, MMA, HJR, Yellowstone Management, Alpha Chiropractic, London Billing, ABC Corporations 1 Through 20 and John Does 1 Through 20, made material misrepresentations and/or omitted material statements in submitting, or causing to be submitted, no fault claims to Plaintiffs for payment.

340. Defendants Ilyaich, Romero, Paez, Susi, Babadzhanova, M. Ilyaich, McGee, Queens-Brooklyn Medical, Queens Jewish Medical, Queens-Roosevelt Medical, Woodward Medical, Advanced Medical, Integrated Medical, Yellowstone Medical, Beach Medical, Executive Corp., Alternative Program Queens, JBL, Fresh Meadows, MMA, HJR, Yellowstone Management, Alpha Chiropractic, London Billing, ABC Corporations 1 Through 20 and John Does 1 Through 20 intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, concealed the fact that Defendants Ilyaich, Romero, Paez and Susi, not McGee, were the true owners of the Defendant PCs, and that the Defendant PCs were engaged

in unlawful fee-splitting, by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:

- Each and every bill and report set forth the name of the Defendant PCs as professional corporations owned by McGee, a medical doctor when in fact they were not. The submission of bills and reports containing the signatures of McGee was a fraudulent misrepresentation, intended to deceive and mislead the Plaintiffs into believing that the Defendant PCs were legal professional corporations when in fact they were not;

- False and misleading statements and information regarding who owned, controlled and operated the Defendant PCs;

- False and misleading statements and information intended to mislead Plaintiffs into believing that the Defendant PCs were being operated by McGee as indicated in their certificates of incorporation when in fact they were not;

- False and misleading statements intended to mislead Plaintiffs that the Defendant PCs were licensed in accordance with applicable New York State Law when in fact they were not;

- False and misleading statements that the Defendant PCs were properly licensed and therefore eligible to recover No-fault benefits pursuant to Insurance Law 5102(a)(1) and 11 NYCRR 65-3.16(a) (12) when in fact it was not;

- False and misleading statements and information intended to circumvent Article 15 of the New York State Business Corporation Law, which prohibits ownership by individuals not licensed to practice the profession for which a medical professional corporation was incorporated;

- False and misleading statements and information, as contained in the signed medical reports and NYS N-F3s, that were intended to deceive and conceal the fact that the Defendant PCs were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that Defendants Ilyaich, Romero, Paez and Susi, and/or others unknown to Plaintiffs, were billing for physician services through fraudulently incorporated PCs;

- False and misleading statements and information set forth in NYS N-F3 forms, medical narrative reports, prescriptions and referrals indicating that McGee was actively involved in the operations of the Defendant PCs and the rendering of services relating thereto when in fact he was not; and

- False and misleading statements contained in each separate bill, medical

> **record and report submitted by Defendants to Plaintiffs regarding the relationships between Executive Corp., Alternative Program Queens, JBL, Fresh Meadows, MMA, HJR, Yellowstone Management, Alpha Chiropractic, the Defendant PCs and McGee; McGee and Ilyaich, Romero, Paez and Susi,; and the Defendant PCs and McGee, which concealed or failed to disclose the actual relationship between said parties and the existence of a fraudulent corporate structure and improper fee-splitting arrangement.**

341.    Defendants knew the foregoing material misrepresentations to be false when made, particularly that the Defendant PCs were properly licensed in accordance with New York State Law and eligible to recover No-fault benefits, and made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

342.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Plaintiffs making substantial payments to the Defendant PCs.

343.    Had Plaintiffs known of the Defendant PCs' illegal corporate structure and fee-splitting, which were contrary to all indications reflected in the medical reports, treatment verifications, and bills for medical treatment and other documents it submitted in support of payment, Plaintiffs would not have paid the Defendant PCs' claims for No-fault insurance benefits submitted in connection therewith.

344.    Plaintiffs were thus injured as a proximate result and are entitled to recover and recoup from the Defendants payments they made to Metropolitan after April 4, 2002, in accordance with the Court of Appeals decision in *State Farm Mut. Auto. Ins. Co. v. Mallela,* 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005).

345.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and

punitive damages.

346.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $2,300,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Unjust Enrichment)

347.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

348.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

349.    Plaintiffs are therefore entitled to restitution from Defendants in the amount by which Defendants have been unjustly enriched.

350.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $2,300,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TENTH CLAIM FOR RELIEF

## AGAINST MCGEE, QUEENS-BROOKLYN MEDICAL, QUEENS JEWISH MEDICAL, QUEENS-ROOSEVELT MEDICAL, WOODWARD MEDICAL, ADVANCED MEDICAL, INTEGRATED MEDICAL, YELLOWSTONE MEDICAL, AND BEACH MEDICAL,

### (Declaratory Judgment)
### (Corporate Practice Of Medicine
### Business Corporation Law §§ 1501, *et seq.*)

351.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

352.    For a period of at least thirteen years, Defendants Ilyaich, Romero, Paez and Susi, and/or others unknown to Plaintiffs have used the name and license of McGee to circumvent the strict tenets of Article 15 of the Business Corporation Law and fraudulently incorporate one or more of the Defendant PCs in order to submit bills to insurers thereunder.

353.    Under New York law, a professional corporation is not eligible to recover No-fault benefits if it is not licensed in accordance with applicable New York State Law and any such entity does not have standing to seek reimbursement under the No-fault Law.  As a matter of eligibility and standing, the New York Court of Appeals held in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or professional corporation not licensed in accordance with New York State Law, such as the Defendant PCs, not formed and/or operated in accordance with Article 15 of the Business Corporation Law, is not entitled to recover No-fault benefits.

354.    As the Defendant PCs are fraudulently incorporated and/or are not licensed and/or operated in accordance with applicable New York State Law, with a nominal owner listed on the certificate of incorporation filed with the Department of State, concealing the true owners, it is respectfully requested that this Court issue an order declaring that Plaintiffs are under no

97

obligation to pay any of Defendants' No-fault claims because the Defendants PCs are not properly licensed in accordance with New York State Law.

355.    As the Defendant PCs are fraudulently incorporated and/or fraudulently licensed and/or operated, with a nominal owner listed on the certificate of incorporation filed with the Department of State, concealing the true beneficial owner, it is respectfully requested that this Court issue an order declaring that the Defendant PCs are ineligible to recover benefits under the New York State No-fault law and Plaintiffs, therefore, are under no obligation to pay any of Defendants' No-fault claims because of the Defendant PCs' illegal corporate structure.

356.    Plaintiffs have no adequate remedy at law.

357.    The Defendant PCs will continue to bill Plaintiffs for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied and any future No-fault claims submitted by the Defendant PCs due to their fraudulent incorporation and operation, regardless of the purported dates of service.

### ELEVENTH CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS

#### (Declaratory Judgment)
#### (Unlawful Fee Splitting)

358.    The allegations of paragraphs 1 through 204 are hereby repeated and realleged as though fully set forth herein.

359.    In order to be eligible to receive No-fault benefits, a provider must adhere to all applicable New York statutes, which grant the authority to provide health services in New York State.

360.    Pursuant to Sections 6509-a, 6530 and 6531 of the Education Law and 8 NYCRR § 29.1, a professional licensed, certified, or registered pursuant to Title VIII of the Education Law is prohibited from permitting any person to share in the fees for professional services, other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner.

361.    On information and belief, the Defendant PCs engaged in unlawful fee splitting with Defendants Ilyaich, Romero, Paez, Susi, Babadzhanova, M. Ilyaich, Moshe and/or others unknown to Plaintiffs and/or the corporate entities substantially owned and/or controlled by them.

362.    In view of the unlawful fee-splitting activities in violation of Sections 6509-a, 6530 and 6531 of New York's Education Law, and 8 NYCRR § 29.1, the Defendant PCs do not have standing to submit or receive assigned No-fault benefits, let alone recover No-fault benefits under New York State Law. *See Necula v. Glass*, 231 A.D.2d 457, 647 N.Y.S.2d 501 (1st Dep't 1996).

363.    A justifiable controversy exists between Plaintiffs and the Defendant PCs since the Defendant PCs challenge Plaintiffs' ability to deny such claims.

364.    Plaintiffs have no adequate remedy at law.

365.    The Defendant PCs will continue to bill Plaintiffs for No-fault services and continue to engage in fee-splitting absent a declaration by this Court that their activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and any future No-fault claims submitted by the Defendant PCs while it was engaged in unlawful fee-splitting.

## I.    **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demands judgment as follows:

i) Compensatory damages in an amount in excess of $2,300,000.00, the exact amount to be determined at trial, together with prejudgment interest.

ii) Punitive damages in such amount as the Court deems just;

iii) Treble damages, costs and reasonable attorneys' fees on the First through Seventh Claims for Relief, together with prejudgment interest;

iv) Compensatory on the Eighth and Ninth Claims for Relief, together with prejudgment interest;

v) Declaratory relief on the Tenth Claim for Relief declaring that (a) the Defendant PCs are ineligible to recover No-fault benefits and (b) Plaintiffs have no obligation pay any unpaid claims, whether pending, previously-denied and/or submitted,  regardless of whether such unpaid claims were ever denied, and any future No-fault claims submitted by the Defendant PCs due to their fraudulent incorporation, illegal corporate structure and/or their not being licensed in accordance with applicable New York State Law, irrespective of the purported dates of service;

vi) Declaratory relief on the Eleventh Claim for Relief declaring that (a) the Defendant PCs are ineligible to recover No-fault benefits and (b) Plaintiffs have no obligation to pay any unpaid claims, whether pending, previously-denied and/or submitted, regardless of whether such unpaid claims were ever denied, and any future No-fault claims submitted by the Defendant PCs due to their engaging

in unlawful fee-splitting, irrespective of the purported dates of service; and

vii)   Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York
       October 2, 2013


                    STERN & MONTANA, LLP


                    By: _____
                        Robert A. Stern (RAS-1282)
                        Sandra P. Burgos (SB-6856)
                        Daniel S. Marvin (DM-7106)
                        James McKenney (JM-6164)
                        Attorneys for Plaintiffs
                        Trinity Centre
                        115 Broadway
                        New York, New York 10006
                        Tel: (212) 532-8100


101